Hessie ANDERSON and Frankie Martin, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

Richard LYNG, Secretary of the United States Department of Agriculture, and Gwendolyn Williams, Commissioner of the Alabama Department of Pensions and Security, Defendants.

Civ. A. No. 85–T–1350–N.

United States District Court,
M.D. Alabama, N.D.

Sept. 11, 1986.

Order and Injunction Sept. 26, 1986.

Lawrence Gardella, Legal Services Corp. of Alabama, Montgomery, Ala., Geraldine Turner-Wofford, Legal Services Corp. of Alabama, Selma, Ala., for plaintiffs.

John C. Bell, U.S. Atty., D. Broward Segrest, Asst. U.S. Atty., Montgomery, Ala., for defendant Block.

James Long, Alabama Dept. of Pensions & Sec., Div. of Legal Services, Montgomery, Ala., for defendant Williams.

### MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

This class action lawsuit is a challenge to the "voluntary quit" regulation promulgated by the Secretary of the U.S. Department of Agriculture under the Food Stamp Act, 7 U.S.C.A. §§ 2011–2029.[1] The Food Stamp Act provides that an entire household is ineligible to participate in a state food stamp program for 90 days if the "head of household" voluntarily quits any job without good cause. 7 U.S.C.A. § 2015(d)(1)(B)(ii). In contrast, the regulation promulgated by the Secretary pursuant to this statutory provision substitutes "primary wage earner" for "head of household" and, accordingly, provides that the household is ineligible if the primary wage earner voluntarily quits any job without good cause. 7 C.F.R. § 273.7(n). Plaintiffs Hessie Anderson and Frankie Martin, whose households were disqualified from receiving food stamps under the regulation,

---

1. The plaintiffs have filed a request to have the court certify a plaintiff class of persons similarly situated to the plaintiffs. Fed.R.Civ.P. 23. Although it is normally preferable for a court to reach the class certification issue as soon as reasonably possible after a lawsuit is filed, the parties here have agreed for the court to delay reaching the class certification issue until after the issue of liability has been determined.

claim that the regulation conflicts with the Food Stamp Act. The defendants are Richard Lyng, Secretary of the U.S. Department of Agriculture, and Gwendolyn Williams, Commissioner of the Alabama Department of Pensions and Security.

This cause is now before the court on the plaintiffs' request that the court declare that the Secretary's voluntary quit regulation impermissibly conflicts with the Food Stamp Act.[2] For reasons that follow, the court concludes that the plaintiffs' request should be granted.

### I.

The modern food stamp program was started in the early 1960's to address the widespread hunger and malnutrition problem in our society. 7 U.S.C.A. § 2011. Most recently, according to Congress, there has been a "significant worsening" of this problem, especially with regard to children. H.R.Rep. No. 99–271, Part 1, 99th Cong., 1st Sess., *reprinted in* 1985 U.S.Code Cong. & Ad. News 1103, 1234–35.

### A.

Under the food stamp program, food coupons, commonly referred to as food stamps, are used to supplement the food buying power of eligible low-income households. The program allows an eligible household to obtain from an administering governmental agency a sufficient number of food stamps to provide the household with a nutritionally adequate diet; the household then uses the stamps, along with its own money, to purchase food at retail stores. The federal government later redeems the stamps at face value. 7 U.S. C.A. §§ 2013–2025. The food stamp program is administered by state public assistance agencies under the supervision of the United States Department of Agriculture's Food and Nutrition Service. 7 U.S.C.A. § 2020; 7 C.F.R. §§ 271.3, 271.4.

Recipients of food stamps under the Food Stamp Act must meet both financial and non-financial requirements. Among the non-financial requirements are various conditions relating to employment. With these employment requirements, Congress sought to limit the program to those who were truly needy by encouraging applicants and participants who were capable of working to do so. As a House Committee recognized in 1970, "it is still desirable for those who can do so to work in order to support themselves and their families." H.R.Rep. No. 91–1402, 91st Cong., 2nd Sess., *reprinted in* 1970 U.S.Code Cong. & Ad. News 6025, 6034.

These employment requirements have a dual focus: they focus on each participating member of a household as well as on the entire household itself. For example, unless exempted, an individual member of a household may not participate in the food stamp program unless he or she registers for employment and participates in employment and training programs, and accepts certain employment, if offered. 7 U.S.C.A. § 2015(d)(1)(A) & (d)(2). In contrast, as already noted, an entire household is ineligible to participate in the program for 90 days "if the head of the household voluntarily quits any job without good cause." 7 U.S.C.A. § 2015(d)(1)(B)(ii). With this voluntary quit provision, Congress sought to place increased emphasis "on providing benefits to those who are unable to provide for themselves and less to those, such as in this situation, who have *made* themselves 'needy.'" Senate Rep. No. 97–504, 97th Cong., 2nd Sess., *reprinted in* 1982 U.S. Code Cong. & Ad.News 1641, 1677 (emphasis in original).

In an attempt to implement this statutory voluntary quit provision, 7 U.S.C.A. § 2013(c), the Secretary of Agriculture promulgated a regulation that, as already noted, defines head of household as the household's primary wage earner. The regulation provides that "No household whose primary wage earner voluntarily quit his or her most recent job without

---

**2.** The plaintiffs also seek injunctive relief in their complaint. The parties have agreed that the issue of relief, including the fashioning of injunctive relief, should be delayed until after the court has first determined liability.

good cause" shall be eligible to participate in the food stamp program. 7 C.F.R. § 273.7(n). Primary wage earner is defined as "that household member age 18 or over who was acquiring the greatest amount of earned financial support for the household at the time of quit." § 273.-7(n)(1)(iv).[3]

### B.

In 1985, the Alabama Department of Pensions and Security, the state public assistance agency responsible for administering the federal food stamp program in Alabama, disqualified plaintiff Hessie Anderson's and plaintiff Frankie Martin's households from receiving food stamps on the basis of the Secretary's voluntary quit regulation. The plaintiffs argue that the Secretary of the U.S. Department of Agriculture and the Commissioner of the Alabama Department of Pensions and Security violated the statutory provision on voluntary quit by disqualifying their households on the basis that their households' primary wage earners quit their jobs; according to the plaintiffs, "head of household," the term used by Congress, and "primary wage earner," the term used by the Secretary, are not equivalent. Indeed, the plaintiffs argue that, at the time their households were disqualified, the heads of their households were different from their households' primary wage earners.[4] For example, at the time Anderson's household was disqualified, the primary wage earner in her household was her 18–year–old son. Her household consisted of twenty-five members, at least three of whom were employed shortly before this litigation began. Because the three incomes were not sufficient to support the entire household, the household received food stamps worth over $600.00 each month. Anderson's husband was named on the food stamp application

as the head of the household, but the Andersons' 18–year–old son Lindsey was actually earning the most money. Lindsey quit his job in August 1985. After making an initial determination that Lindsey had not had good cause for quitting, the Alabama Department of Pensions and Security notified the Anderson household that the entire household would be disqualified from receiving food stamps for three months because Lindsey, the primary wage earner, had voluntarily quit his job without good cause.

### II.

In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), the Supreme Court succinctly set forth the criteria and the manner in which a court should assess whether an agency's interpretation of a legislative act is permissible under that act:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is

---

**3.** While the statute provides that a person need only be 16 to be subject to the voluntary quit provision, the regulation provides that a person must be at least 18. It appears that the statutory lowering of the age occurred recently and that the Secretary has not yet had a chance to amend the regulation accordingly. *See* notes 6 and 7, *infra*.

**4.** The defendants have agreed to reinstate and to maintain the plaintiffs' households on the food stamp program during the pendency of the case, but with the understanding that should the defendants prevail the plaintiffs will have to repay all food stamp benefits improperly received.

whether the agency's answer is based on a permissible construction of the statute. (footnotes omitted).

In other words, absent evidence that Congress has expressly given a statutory provision a particular interpretation, a court must give deference to any reasonably acceptable interpretation by the agency. For reasons that follow, the court is convinced that Congress has expressly given the Food Stamp Act's voluntary quit provision a particular interpretation contrary to the Secretary's, and that, moreover, the Secretary's interpretation is illogical and unworkable and contrary to the plain meaning of the statutory provision.

### A.

The first step in determining whether Congress has expressly and unequivocally given a statutory provision a particular meaning is to look to the plain meaning of the provision itself. *Board of Governors v. Dimension Financial Corp.*, — U.S. ——, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986). Here, head of household, the phrase that appears in the Food Stamp Act, suggests on its face the most responsible person in the household, the person with primary responsibility for the household. *See Webster's Third New International Dictionary*, 1046 (1976) ("head" defined as "director, chief," "one in charge"); *Black's Law Dictionary*, 648 (1979) ("head of family or household" means the person legally or morally obligated and entitled to, and who actually does, support, maintain and control family). The Secretary's designation of the primary wage earner as the head of the household may well be accurate in many, if not most, instances; to be sure, the head of household will often be the primary wage earner since the head has primary responsibility for the family. This characteristic is not essential, however. Undoubtedly, there are many households, in particular low-income households, where the parents are unemployed or underemployed and where it is thus easily conceivable that a minor child is the primary wage earner. However, one should be safely

able to assume—indeed, it should be so hoped if the family as an institution is to survive in bad times as well as good—that such households retain the traditional family structure in which the father or mother keeps track of finances, makes basic decisions about where and how the family will live, and is thereby the head of family, with primary responsibility for the household.

Therefore, when it used the term head of household in the voluntary quit provision, Congress clearly had in mind something different from just primary wage earner. If Congress had intended to tie the voluntary quit provision to only the primary wage earner in the family, Congress could have said just that; it could have used the term primary wage earner. Instead, Congress used the term head of household, thereby acknowledging and fostering the traditional family structure by recognizing that in matters that concern the household as a whole the food stamp program should look to the person primarily responsible for family, irrespective of whether the person is the primary wage earner. Congress sought to discourage households from making themselves needy, but not at the expense of the traditional family structure. The use of the term head of household therefore reflects a Congressional balancing of societal considerations which the Secretary has ignored with the use of the term primary wage earner.

### B.

The plaintiffs' contention that the Secretary may not equate head of household to primary wage earner is also supported by the historical usage of the term among state and federal public assistance agencies both before and after Congress passed the voluntary quit provision in 1977. The term head of household has always had and continues to have a well accepted meaning among public assistance agencies. According to the evidence submitted to the court, many state agencies have consistently defined head of household as the person who assumes general responsibility for the household; many other state agencies have

viewed the term in more economic terms and defined head of household as the person who normally or actually assumes primary financial responsibility for the household; and many other state agencies have defined head of household as the person in whose name an application for food stamps benefits is made, thereby again demoting some element of responsibility. Indeed, at the time Congress enacted the voluntary quit provision, the Department of Agriculture itself had historically defined the head of household in the food stamp program to be that "member of the household in whose name application is made." *See, e.g.,* 7 C.F.R. § 270.2(gg) (1976); 7 C.F.R. § 1600.-2(s) (1964). Without question, the common thread running through the usage of the term head of household, both in the past and today, is a household member's assumption of primary responsibility for the household.

"Congress is deemed to know the executive and judicial gloss given certain language and thus adopts the existing interpretation unless it affirmatively acts to change the meaning.... Congressional silence in the Act indicates acceptance of the prior practice." *Florida National Guard v. Federal Labor Relations Auth.,* 699 F.2d 1082, 1087 (11th Cir.), *cert. denied,* 467 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983) (citations omitted). As reflected above, the evidence here is undisputed that at the time Congress enacted the voluntary quit provision the term head of household meant that member of the household with primary responsibility for the household.

### C.

The legislative history of the voluntary quit provision reflects that Congress relied upon and adopted the historical usage of the term head of household. In describing the Food Stamp Act prior to the addition of the voluntary quit provision in 1977, a House Report viewed the head of household as that person in the household with primary responsibility for the household. According to the House Report, the exist-

ing law provided that a household must apply for food stamps "through its head or spouse or his or her authorized representative." H.R.Rep. No. 464, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad.News 1704, 1971, 2199. If the head or the spouse is unable to apply, "a responsible household member may be designated as the authorized representative", *id.* at 2200; alternatively, "a responsible adult outside the household may be designated if the head of the household, the spouse, or other responsible household members cannot be interviewed." *Id.* There are two ways in which this language suggests that the head of the household must be a responsible adult. First, the reference to the head's spouse implies that Congress assumed that the head would be a parent or traditional family head rather than a child who happened to earn a relatively high salary. Second, the requirement that any substitute for the head must be some "other responsible household member" or a "responsible adult outside the household" implies that the head must also be a responsible person. Indeed, in justifying the need for the voluntary quit provision, the House Report stated that "[t]here is no prohibition ... against the head of a household (*that member in whose name application is made for participation in the program*) that was, while the head was working, ineligible for food stamps quitting work and thereby rendering the entire household eligible for food stamps." *Id.* at 2138 (emphasis added). This language directly defines the head of a household as the member in whose name the application is made, and thereby strongly implies that Congress intended the applicant to be a responsible adult.

Admittedly, in 1981, when Congress extended the voluntary quit disqualification to include recipient as well as applicant households, the phrase primary wage earner appeared in House and Senate Conference Committee Reports as if it were the equivalent of head of household.[5] For ex-

---

**5.** When the voluntary quit provision was enact-   ed in 1977, it applied only to households apply-

ample, the House Conference Committee explained that "The House amendment extends the scope of the existing law disqualifying *applicant* households for 60 days, if the primary wage earner has voluntarily quit a job without good cause, to include recipient households.... The Conference ... adopts the House amendment." H.R. Conference Rep. No. 377, 97th Cong., 1st Sess., *reprinted in* 1981 U.S.Code Cong. & Ad.News 1965, 2250, 2315 (emphasis in original). The same language appeared in the Senate Conference Committee report. Senate Conference Rep. No. 290, 97th Cong., 1st Sess., p. 218 (1980). This language, however, is not entirely persuasive, for it only appeared in the context of amendments to the already enacted provision on voluntary quits. "[I]solated statements by individual Members of Congress of its committees, all made after the enactment of the statute under consideration, cannot substitute for a clear expression of legislative intent at the time of the enactment." *Southeastern Community College v. Davis*, 442 U.S. 397, 411 n. 11, 99 S.Ct. 2361, 2370 n. 11, 60 L.Ed.2d 980 (1979). The fact therefore that, four years after the quit provisions were first enacted, Congressional committees used the phrase primary wage earner does little to show that Congress actually intended head of household to mean primary wage earner all along. In any case and most significantly, when the disqualification period was extended from 60 days to 90 days in 1982, the Senate and House Committees reverted to the phrase head of household and made no mention of primary wage earner. Senate Rep. No. 504, 97th Cong., 2nd Sess., *reprinted in* 1982 U.S.Code Cong. & Ad. News 1641, 1677, 1728; House Report No. 687, 97th Cong., 2nd Sess., p. 85 (1982).

### D.

The administrative history of the Secretary's adoption of his definition of head of household also belies his contention that head of household means primary wage

earner. First, in 1978, in an effort to promulgate the regulation enforcing the voluntary quit provision, the Secretary openly stated that "The title 'head of household' is currently assigned to the person in whose name application is made for the program." 43 Fed.Reg. 18879 (May 2, 1978). Thus, the Secretary has himself acknowledged that the term head of household has historically denoted responsibility.

But second, and perhaps most importantly, the Secretary himself found that, if used throughout the food stamp program, his definition of head of household as primary wage earner was simply unworkable. State agencies have always looked to the head of each household for the purposes of gathering information and assisting the household in obtaining food stamps. Since the person considered to be the head was the person primarily responsible for the household, the head of the household seldom changed, as would be expected. When the Secretary attempted to adopt an across-the-board definition of household head as the primary wage earner, the state agencies complained vehemently. The agencies pointed out that the primary wage earner would often change as the salaries in the household changed, with the result that the person whom an agency should view and consider as responsible for the household and as an agency's principal contact with the household, would also often change.

To resolve this problem, the Secretary took the unusual step of giving the term head of household two different definitions in the food stamp program. For purposes of the voluntary quit provision, the Secretary defined head of household as the primary wage earner. 7 C.F.R. § 273.7(n). For all other purposes in the food stamp program, the Secretary promulgated a regulation that provided that "State agencies may designate the head of household or permit the household to do so." 7 C.F.R. § 273.1(d). In implementing this regulation, the state agencies have opted to continue to use their historical definitions of head of household.

---

ing for food stamp benefits; it did not apply to households already certified to receive such

benefits. As already stated, Congress extended the provision to recipient households in 1981.

This administrative history clearly reflects that primary wage earner is not a true, workable definition of head of household; for, if it were, the definition should work across-the-board, throughout the food stamp program. This history is therefore unique in the sense that it provides direct, practical evidence that the Secretary's definition is in direct conflict with the plain, common-sense and historical definition of head of household.

### E.

Finally, should the preceding discussions leave any doubt that head of household should not be equated to primary wage earner, that doubt is completely dispelled by the recent, 1985 amendments to the Food Stamp Act. Prior to 1985, the term head of household appeared only once in the Act and that was in the voluntary quit provision, 7 U.S.C.A. § 2015(d).[6] In 1985, the section of the Act containing the voluntary quit provision was amended such that the term now appears four times; the section not only continues to use the term in the voluntary quit provision, 7 U.S.C.A. § 2015(d)(1)(B)(ii) it also uses the term in the three other related provisions, 7 U.S.C.A. § 2015(d)(1) & (2).[7] As is clear from what follows, and assuming as one logical-

---

6. Prior to 1985, section 2015(d)(1) & (2) provided as follows:

(d) Refusal to register for or accept employment. (1) Unless otherwise exempted by the provisions of paragraph (d)(2) of this subsection, no household shall be eligible for assistance under this Act if it includes a physically and mentally fit person between the ages of eighteen and sixty who (i) refuses at the time of application and once every twelve months thereafter to register for employment in a manner determined by the Secretary; (ii) refuses to fulfill whatever reasonable reporting and inquiry about employment requirements as are prescribed by the Secretary, which may include a requirement that, at the option of the State agency, such reporting and inquiry commence at the time of application; (iii) is *head of the household* and voluntarily quits any job without good cause: Provided, That the period of ineligibility shall be ninety days; or (iv) refuses without good cause (including the lack of adequate child care for children above the age of five and under the age of twelve) to accept an offer of employment at a wage not less than the higher of either the applicable State or Federal minimum wage, or 80 per centum of the wage that would have governed had the minimum hourly rate under the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(a)(1)), been applicable to the offer of employment, and at a site or plant not then subject to a strike or lockout. An employee of the Federal Government, or of a State or political subdivision of a State, who engaged in a strike against the Federal Government, a State or political subdivision of a State and is dismissed from his job because of his participation in the strike shall be considered to have voluntarily quit such job without good cause.
(2) A person who otherwise would be required to comply with the requirements of paragraph (1) of this subsection shall be exempt from such requirements if he or she is

(A) currently subject to and complying with a work registration requirement under Title IV of the Social Security Act, as amended (42 U.S.C. 602) or the Federal-State unemployment compensation system, in which case, failure by such person to comply with any work requirement to which such person is subject that is comparable to a requirement of paragraph (1) shall be the same as failure to comply with that requirement of paragraph (1). (B) a parent or other member of a household with responsibility of a dependent child under age six or of an incapacitated person; (C) a bona fide student enrolled at least half time in any recognized school, training program, or institution of higher education (except that any such person enrolled in an institution of higher education shall be ineligible to participate in the food stamp program unless he or she meets the requirements of subsection (e) of this section); (D) a regular participant in a drug addiction or alcoholic treatment and rehabilitation program; or (E) employed a minimum of thirty hours per week or receiving weekly earnings which equal the minimum hourly rate under the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(a)(1)), multiplied by thirty hours.
(Emphasis added).

7. Section 2015(d)(1) & (2) now provides as follows:

(d) Refusal to register for or accept employment; exception; labor disputes and strikes; employment and training programs.
(1) Unless otherwise exempted by the provisions of paragraphs (d)(2) of this subsection, (A) no person shall be eligible to participate in the food stamp program who is physically and mentally fit person between the ages of sixteen and sixty who (i) refuses at the time of application and once every twelve months thereafter to register for employment in a

ly must that a term has the same meaning throughout the same section of an act, if not throughout the same act, the term primary wage earner is an illogical and unworkable substitute for head of household as used in the other three provisions.

### i.

As already explained, some provisions of the Food Stamp Act disqualify individual members of a household, but not the entire household, from participating in the food stamp program, while other provisions disqualify the entire household. Section 2015(d)(1)(B)(i) is one of those provisions that disqualify an entire household; it pro-

hibits a household from participating in the food stamp program if the "head of the household" refuses to comply with the section's training, registration and other similar employment requirements. It is apparent from the face of this provision that Congress intended that it serve as a vehicle for getting entire households back on some regular income as soon as possible. Clearly, this intent would be best effected by placing this extra training and employment incentive on the person primarily responsible for the household, the person most likely to remain with the household and support it over the years. This intent would not be served as well by placing this

manner determined by the Secretary; (ii) refuses without good cause to participate in an employment and training program under paragraph (4) to the extent required under paragraph (4), including any reasonable employment requirements as are prescribed by the State agency in accordance with paragraph (4), and the period of ineligibility shall be two months; (iii) refuses without good cause (including the lack of adequate child care for children above the age of five and under the age of twelve) to accept an offer of employment at a wage not less than the higher of either the applicable State or Federal minimum wage or 80 per centum of the wage that would have governed had the minimum hourly rate under the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(a)(1)) been applicable to the offer of employment, and at a site or plant not then subject to a strike or lockout; and (B) no household shall be eligible to participate in the food stamp program (i) if the *head of the household* is a physically and mentally fit person between the ages of sixteen and sixty and such individual refuses to do any of those acts described in clause (A) of this sentence, or (ii) if the *head of household* voluntarily quits any job without good cause, but in such case, the period of ineligibility shall be ninety days. An employee of the Federal Government, or of a State or political subdivision of a State, who engaged in a strike against the Federal Government, a State or political subdivision of a State and is dismissed from his job because of his participation in the strike shall be considered to have voluntarily quit such job without good cause. Any period of ineligibility for violations under this paragraph shall end when the household member who committed the violation complies with the requirement that has been violated. If the household member who committed the violation leaves the household during the period of ineligibility, such household shall no longer

be subject to sanction for such violation and, if it is otherwise eligible, may resume participation in the food stamp program, but any other household of which such person thereafter becomes the *head of the household* shall be ineligible for the balance of the period of ineligibility.

(2) A person who otherwise would be required to comply with the requirements of paragraph (1) of this subsection shall be exempt from such requirements if he or she is (A) currently subject to and complying with a work registration requirement under Title VI of the Social Security Act, as amended (42 U.S.C. 602) or the Federal-State unemployment compensation system, in which case, failure by such person to comply with any work requirement to which such person is subject that is comparable to a requirement of paragraph (1) shall be the same as failure to comply with that requirement of paragraph (1); (B) a parent or other member of a household with responsibility for the care of a dependent child under age six or of an incapacitated person; (C) a bona fide student enrolled at least half time in any recognized school, training program, or institution of higher education (except that any such person enrolled in an institution of higher education shall be ineligible to participate in the food stamp program unless he or she meets the requirements of subsection (e) of this section; (D) a regular participant in a drug addiction or alcoholic treatment and rehabilitation program; (E) employed a minimum of thirty hours per week or receiving weekly earnings which equal the minimum hourly rate under the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(a)(1)), multiplied by thirty hours or (F) a person between the ages of sixteen and eighteen who is not a *head of household* or who is attending school, or enrolled in an employment training program, on at least a half-time basis.
(Emphasis added).

extra incentive on someone else, most likely a teenager, who, though the primary wage earner, is not legally or morally responsible for the welfare of the entire family and is more than likely to leave the family when he or she becomes of age in the near future.

Moreover, if the primary wage earner were always considered the head of the household, this provision would have a senseless effect. The provision would discourage an ineligible member of an eligible household from ever increasing his or her income to the point where he or she brought home the largest pay check, thereby becoming the primary wage earner and disqualifying the entire household. Surely, Congress did not intend to discourage any household member, eligible or ineligible, from increasing his or her income as much as possible.

### ii.

Another provision that disqualifies an entire household is found in section 2015(d)(1). This provision provides that if a disqualified member of the household leaves that household and becomes head of another household, the entire new household is ineligible to participate in the food stamp program. This provision merely complements other provisions of the Food Stamp Act that disqualify a household if its present head fails to comply with the employment requirements of the food stamp program. With this provision and the other provisions, a household is ineligible regardless as to whether its head becomes ineligible before or after becoming head. If the term primary wage earner were substituted for head of household, this provision would have the same senseless result as would the previously discussed section 2015(d)(1)(B)(i). The provision would, in effect, discourage an ineligible member of a new household from ever increasing his or her income to the extent of becoming the household's primary wage earner and thereby disqualifying the entire household.

As already observed, Congress surely did not intend this.

### iii.

Finally, section 2015(d)(2)(F) provides that persons between 16 and 18 are exempt from the employment requirements of the food stamp program unless they are heads of households. This provision is clearly aimed at exempting teenagers from the employment requirements unless they have, in effect, started a separate family of their own and have thereby assumed responsible adult roles in society; this provision thus contains the reasonable requirement that teenagers with families must comply with the training, registration and other work requirements of the food stamp program. Only if the head of household is defined as the person primarily responsible for the household is this aim fully realized.

Indeed, this provision would be somewhat illogical if the term primary wage earner were substituted for head of household. With this substitution, the provision would no longer be aimed specifically at teenage parents but at teenagers in general; and, with this different focus, the tying of the employment requirements to only the teenage primary wage earner would appear to be misplaced. It is apparent that the food stamp program's training, registration and other employment requirements would better serve a teenager without a job, or earning little money, than a teenager who makes the most money in the household and is the primary wage earner.

### III.

In conclusion, the court is convinced that the Secretary's definition of head of household as the primary wage earner conflicts with the plain meaning and common sense understanding of the term; that it conflicts with the meaning and understanding of the term as expressed over the years by not only Congress but the Secretary himself; and that it is illogical and unworkable under the Food Stamp Act.[8]

---

**8.** The plaintiffs contend that the court should require that the Secretary define head of household as the person in whose name the house-

hold's food stamp application is made. The court rejects this contention. It is clear from the preceding discussion that the plaintiffs' defi-

The court will therefore enter an order declaring that the Secretary's voluntary quit regulation, which in effect defines head of household to mean primary wage earner, is impermissible under the Food Stamp Act.

## ORDER

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court that it is DECLARED that defendant Secretary of the United States Department of Agriculture's voluntary quit regulation, 7 C.F.R. § 273.7(n) (1986), impermissibly conflicts with the voluntary quit provision in the Food Stamp Act, 7 U.S.C.A. § 2015(d)(1)(B)(ii) (West Supp.1986).

It is further ORDERED that the issues of injunctive relief and class certification are set for an in-chambers prehearing conference on September 24, 1986, at 4:30 p.m. at the federal courthouse in Montgomery, Alabama, and for a final court hearing on October 7, 1986, at 9:00 a.m. in the second floor courtroom of the federal courthouse in Montgomery, Alabama.

## ORDER AND INJUNCTION

At an in-chambers conference on September 24, 1986, the parties agreed that the court could proceed immediately to award the plaintiffs a prospective injunction based upon the declaratory relief the court awarded on September 11, 1986. The parties dispute whether the plaintiffs are entitled to any retrospective relief, in light of the eleventh amendment to the U.S. Constitution.

In accordance with this court's memorandum opinion of September 11, 1986, it is therefore the ORDER, JUDGMENT, and DECREE of the court that:

(1) It is DECLARED that the plaintiffs are entitled to prospective injunctive relief; and

(2) Defendants Secretary of the United States Department of Agriculture and Commissioner of the Alabama Department of Pensions and Security are ENJOINED and RESTRAINED, effective September 11, 1986, from disqualifying any food stamp household on the basis of a voluntary quit, without good cause, of a "primary wage earner," as defined in 7 C.F.R. § 273.7(n) (1986), who is not the head of that household.

nition is also inappropriate. Although state agencies and the Secretary have often referred to the head of household as the person in whose name the food stamp application is made, it is apparent from the legislative and administrative history of the voluntary quit statutory provision and regulation that this reference is more or less an effort to require that the head of the household be the applicant, if possible.