**Annie WILSON; Gloria Green, on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,**

**v.**

**Richard LYNG, in his official capacity as Secretary of the U.S. Department of Agriculture, Defendant–Appellant,**

**and**

**David T. Flaherty, in his official capacity as Secretary of N.C. Department of Human Resources; Millie Brown, in her official capacity as Director of the Duplin County Department of Social Services; John Syria, in his official capacity as Director of the N.C. Division of Social Services; J.F. McKeithan, in his official capacity as Director of the Richmond County Department of Social Services, Defendants.**

No. 88–1557.

United States Court of Appeals, Fourth Circuit.

Argued July 13, 1988.

Decided Sept. 7, 1988.

Richard Alan Olderman (Leonard Schaitman, Civil Div., Dept. of Justice, Washington, D.C.; J. Douglas McCullough, U.S. Atty., Raleigh, N.C., John R. Bolton, Asst.

**632**

Atty. Gen., Washington, D.C., on brief) for defendant-appellant.

John L. Saxon, Hillsbough, (North State Legal Services, Inc.; Richard M. Klein, Mason T. Hogan, Legal Services of the Lower Cape Fear, on brief), for plaintiffs-appellees.

Before CHAPMAN, WILKINSON, and WILKINS, Circuit Judges.

WILKINSON, Circuit Judge:

In this class action, food stamp claimants challenge the Secretary of Agriculture's regulations enforcing certain provisions of the Food Stamp Act. The regulations implement the Act's "voluntary quit" provision, which disqualifies households from participating in the food stamp program when the head of the household voluntarily quits his or her job without good cause. The district court invalidated the regulations. We reverse.

### I.

The voluntary quit provision of the Food Stamp Act, first enacted in 1977, provides that:

> [N]o household shall be eligible to participate in the food stamp program ... (ii) if the head of the household voluntarily quits any job without good cause, but, in such case, the period of ineligibility shall be ninety days.

7 U.S.C. § 2015(d)(1)(B)(ii). The Act does not define "head of household," but grants to the Secretary the authority to "issue such regulations consistent with [the Act] as [he] deems necessary or appropriate." 7 U.S.C. § 2013(c).

Pursuant to that authority, the Secretary promulgated regulations in 1978 defining "head of household" for purposes of the voluntary quit provision as the "primary wage earner." 7 C.F.R. § 273.7(c) (1980). The term "primary wage earner" was defined as "that household member age 18 or over who was acquiring the greatest amount of earned financial support for the household at the time of the quit." 7 C.F.R. § 273.7(c)(1)(ii) (1980).

The Secretary promulgated new regulations in 1986. These regulations define "head of household" for purposes of the voluntary quit provision as the "principal wage earner," and define "principal wage earner" as "the household member ... who is the greatest source of earned income in the two months prior to the month of the violation." 7 C.F.R. § 273.1(d) (1988). In certain respects, the 1986 regulations are less stringent than their predecessors. The 1986 regulations exempt from the definition of "principal wage earner" anyone who works less than twenty hours per week, earns less than a stated minimum, or lives with a parent or person fulfilling the role of parent who meets certain requirements. 7 C.F.R. § 273.1(d)(2) (1988).

The named plaintiffs in this suit were disqualified under the 1978 regulations. Annie Wilson was a 63–year old disabled woman who lived with her three sons and received social security disability benefits. When her son became employed in 1986, her food stamp benefits were reduced, and when he voluntarily quit his job, Wilson's household was disqualified. Gloria Green lived with her two minor children and her 22–year old brother-in-law Robin. Robin quit his job in July, 1986, and Green's household was disqualified when she applied for food stamps in September of that year.

Wilson and Green brought a class action on behalf of all food stamp applicants denied benefits after October 24, 1985 under the voluntary quit provision and its corresponding regulations. The district court found both the 1978 and 1986 regulations inconsistent with congressional intent, and invalidated them. *Wilson v. Lyng*, 662 F.Supp. 1391 (E.D.N.C.1987).

### II.

The district court appears to have viewed its role as one of passing on the substantive fairness of the regulations as applied to the named plaintiffs. It found the regulations "unjust," and held that they failed "to treat individuals fairly." 662 F.Supp. at 1395. In the Wilson case, for example, the district court found it unjust that the

Secretary's definition permitted a son who quit his job without cause to disqualify the entire household from receiving benefits. *Id.*

In so doing, the district court misconceived its function. Legislation and regulation necessarily involve inclusion and exclusion along general lines that may affect particular individuals in ways that seem arbitrary or unfair. It is the duty of the legislature and its delegates, however, not the courts, to weigh the general benefit of laws against the possibility that they will unfairly burden particular individuals. *Knebel v. Hein,* 429 U.S. 288, 294, 97 S.Ct. 549, 553, 50 L.Ed.2d 485 (1977); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). As the Third Circuit has noted, "concern for a particularized situation is not grounds for voiding a regulation designed to deal with thousands of cases.... In a social welfare case we must recognize the 'limitations on the practical ability of the State to remedy every ill.'" *Lugo v. Schweiker,* 776 F.2d 1143, 1150–51 (3d Cir.1985), (quoting *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)).

■ In this case, it was the province of Congress and the Secretary to weigh the needs of individual recipients like Wilson and Green against the broader needs of the food stamp program. The voluntary quit provision clearly states that the actions of a single individual in quitting a job without good cause may disqualify an entire household. 7 U.S.C. § 2015(d)(1)(B)(ii). Absent constitutional infirmities, the fairness of such a result is simply outside the purview of the courts. Nor may the courts examine the fairness of the Secretary's determination that the actions of a son may disqualify an entire household. Rather, courts are limited to ensuring that the administrative determination was based upon a reasonable construction of the statute. However de-

serving particular individuals may be, it is not within the courts' power to redraw the balance drawn by Congress and the Secretary.

In striking down these regulations, the district court also misconstrued their effect. It asserted that, under the Secretary's definition, a "child" could be considered a "head of household." 662 F.Supp. at 1394–95. It also stated that the Secretary's definition of that term "punishes teenagers who earn more income than their parents [and] forces teenagers to refrain from working in order to preserve their right to go to school." 662 F.Supp. at 1395.

■ This Dickensian view of the regulations is unwarranted. First, the regulations do not allow a "child" to be considered the head of a household. The 1978 regulations limit the definition of that term to individuals age eighteen and over, 7 C.F.R. § 273.7(c)(1)(ii) (1980), and the 1986 regulations exempt from the definition of principal wage earner any person living with a parent or person fulfilling the role of parent who meets certain requirements. 7 C.F.R. § 273.1(d)(2) (1988). The regulations do not affect the ability of anyone to attend school; they specify that attending school constitutes "good cause" for purposes of the voluntary quit provision. 7 C.F.R. § 273.7(n)(3)(iii) (1988).[1] The district court also objected to the fact that, in the case of Green, an individual "not a blood relative of anyone else in the household" was considered head of the household. 662 F.Supp. at 1395. Because a household's members need not be related in order to participate in the food stamp program, *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), that consideration was not relevant.

1. The district court held that the Secretary's definition of "head of household" was irrational as applied to the work registration requirements of 7 U.S.C. § 2015(d). It ruled that that provision exempts from the work registration requirements sixteen to eighteen year olds who attend school or an employment training pro-

gram on a half-time basis only if they are not heads of households. 662 F.Supp. at 1395. This simply misreads the statute, which exempts *all* sixteen to eighteen year olds who attend school or a training program half-time, even if they are heads of households. 7 U.S.C. § 2015(d)(2)(F).

**634**

### III.

▇ The district court ruled that the Secretary's regulations defining "head of household" under the voluntary quit provision of the Food Stamp Act were inconsistent with the clear intent of Congress. Because we find that the Secretary's regulations are based on a permissible construction of the statute, we reverse. *See NLRB v. United Food and Commercial Workers Union, Local 23,* —— U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *Chevron, U.S.A. v. NRDC,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Plaintiffs would define "head of household" in a traditional sense. They contend that the term ordinarily means "the person who makes basic decisions about where and how the family will live, who has primary responsibility for the health and well-being of others in the household, and who exercises control over the household," whether or not that person is the primary wage earner. *See Anderson v. Lyng,* 644 F.Supp. 1372, 1375 (M.D.Ala.1986) ("the person with primary responsibility for the household").

In plaintiffs' view, and in the district court's, the voluntary quit provision of the Food Stamp Act was intended to place a burden, and a corresponding incentive to remain employed, on the traditional family head. Under this view, defining "head of household" as the principal wage earner may contravene congressional intent by removing this burden from the individual "entrusted with the responsibility for the care" of the household and placing it on the primary wage earner even if the latter is not the traditional head of the family.

The Secretary, however, argues that the ordinary meaning of the term includes the person who contributes most to the household's financial well-being. According to the Secretary, the voluntary quit provision is intended to encourage households to remain economically self-sustaining. This goal, the Secretary argues, can best be met by requiring the individual most responsible for the household's financial welfare to remain employed. By using the term "head of household," he argues, Congress intended to place a burden on that individual to remain employed.

As this case illustrates, the absence of any statutory definition of the term "head of household" has left that term the subject of debate. Plaintiffs would define it in terms of intangible responsibilities, while the Secretary would define it simply as the person who makes the largest financial contribution to the household. The term itself can support either of these readings. In such a situation, the Supreme Court has made clear that deference is owed the agency charged with administering the statute. If "Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, ... Rather, ... the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782; *see also NLRB v. UFCWU,* 108 S.Ct. at 421.

The Secretary's construction of the statute is reasonable, and is not precluded by the statute's language or legislative history. *See Watkins v. Cantrell,* 736 F.2d 933, 944 (4th Cir.1984).[2] The "voluntary quit" provision of the statute precludes those who are able to work from qualifying their households for food stamps by the simple expedient of voluntarily quitting their jobs. The Secretary's regulation likewise encour-

---

**2.** Plaintiffs argue that legislative history demonstrates that the regulations violate congressional intent. They point to a 1977 House Report which equates the term "head of household" with "that member in whose name application is made" and with "responsible household member." H.Rep. No. 345, 95th Cong., 1st Sess., 168, 264, *reprinted in* 1977 U.S.Code Cong. & Admin. News 1704, 1941, 2138, 2200. The district court in *Anderson, supra,* relied on this language in holding that Congress intended "head of house-

hold" to mean "a parent or traditional family head" or a "responsible person." 644 F.Supp. at 1376.

We hesitate, however, to assign great weight to these isolated statements. As the Secretary notes, they mirror the formulation contained in the pre–1978 regulations in effect at the time the statements were made. They appear to be simply acknowledgments of those regulations, rather than affirmative statements of congressional intent.

ages those who can work to remain employed and, by excluding from the program households which can prove self-sufficient, maximizes the funds available to the truly needy.

It is doubtful that plaintiff's definition would advance this congressional purpose to the same extent. Plaintiffs' definition of "head of household," and that adopted by the district court, would reopen the loophole closed by the voluntary quit provision, allowing those who can work, but who are not heads of families in the traditional sense, to qualify their households for food stamps by leaving their employment. At the inception of the food stamp program in 1964, the head of household may generally have been a working parent who was both primary wage earner and, to use plaintiff's formulation, the one most responsible for basic familial decisions. As the Secretary notes, however, the composition of households has changed substantially in recent years. From 1970 to 1980, married couple households increased 9.8%, female headed households increased 58.3%, and non-family households increased by more than 75%. U.S. Dept. of Commerce, Bureau of the Census, 1986 Statistical Abstract of the United States 39; *see also* 7 U.S.C. § 2012(i)(2) (defining household to include unrelated individuals who customarily purchase food and prepare meals together); *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (striking down statutory provision limiting food stamp eligibility to households consisting of related individuals). The Secretary's regulation captures this changing reality. A household's breadwinner may now often be someone other than the traditional family head.

Plaintiffs would also have the Secretary make a subjective determination in each case as to the individual "responsible" for and exercising "control" over the household. The need to make these determinations would greatly increase the burden on the Secretary of administering the voluntary quit provision. In addition, such a requirement would cast the Secretary into a social and cultural thicket from which there could be no easy escape. Traditional family structures may not apply to households consisting of unrelated individuals, and today may often not apply even to households made up of related persons. Were the Secretary to attempt to determine, in each case, the individual "responsible" for the household in a traditional sense, his determinations would always be subject to the charge that he relied on impermissible cultural or sexual stereotypes. The Secretary is entitled to avoid burdens like these to the extent that he does so in accordance with the statute's command. Short of allowing each household to choose its own head, which would eviscerate the voluntary quit provision, it is administratively most convenient to define the head of a household as its primary wage earner. Since that definition does not contravene the statute, it is entitled to our deference.

### IV.

■ The district court struck down both the 1978 and the 1986 regulations. For many of the reasons given in the foregoing section, we think it erred in invalidating the later regulations too.

The 1986 regulations continue to define "head of household" as the household member earning the highest wages. Their definition of "principal wage earner" differs from the 1978 definition of "primary wage earner" in that it exempts persons who work less than twenty hours per week, who earn less than a stated minimum, or who live with a parent or person fulfilling the role of parent who meets certain requirements. 7 C.F.R. § 273.1(d)(2) (1988). As is discussed above, the Secretary is entitled to define "head of household" as the household's chief wage earner. The differences between the 1978 and 1986 regulations do not alter this conclusion. In fact, the 1986 regulations are, if anything, less restrictive than their predecessors.

### V.

Congress has not defined in the Food Stamp Act itself the critical term "head of household." Where Congress has left a

gap in a statute, the agency charged with administering that statute must ordinarily fill that gap. Agency interpretation of regulatory statutes possesses several advantages that the federal judiciary is bound to respect. The agencies that administer statutes have greater expertise in interpreting them, and are in a position to provide nationally uniform interpretations of statutory terms. This informed and consistent interpretation is preferable to the varying interpretations likely to result from the episodic interventions of the courts.

Regulations are adopted after a notice and comment period which affords politically interested parties the opportunity to participate in their formulation, 5 U.S.C. § 553. In this case, the notice and comment procedure was extensive. More than 300 comments were received on the initial 1978 regulations, 43 Fed.Reg. 47846, 47853 (Oct. 17, 1978), and the regulations were altered in view of those comments. 43 Fed.Reg. 54253, 54254 (Nov. 21, 1978); 44 Fed.Reg. 17982, 17983 (Mar. 23, 1979). The proposed regulations were, as required, submitted to Congress with a "detailed statement" justifying them. 7 U.S.C. § 2013(c). There is every reason to believe that this process is as responsive to the competing considerations embodied in the regulations as litigation could be.

An agency is, of course, bound to respect congressional intent, and the courts, along with Congress, operate to ensure fidelity. Here, however, the Secretary's regulation furthers the statutory goal of self-sufficient household units. That being so, the inquiry ends. The courts which administer our system of law are not always at liberty to pursue their own ideals of justice.

The judgment of the district court is

REVERSED.