Hessie ANDERSON, et al., Plaintiffs,

v.

Clayton K. YEUTTER,[1] etc., et al., Defendants.

Civ. A. No. 85–T–1350–N.

United States District Court,
M.D. Alabama, N.D.

Nov. 20, 1989.

fendants, the speedy trial time had not yet begun to run at all.

1. Clayton K. Yeutter has replaced Richard Lyng as Secretary of the United States Department of Agriculture, and the court has, accordingly, substituted Yeutter for Lyng as a defendant in this lawsuit.

Lawrence Gardella, Montgomery, Ala., Geraldine Turner–Wofford, Legal Services Corp. of Ala., Selma, Ala., for plaintiffs.

John C. Bell, U.S. Atty., D. Broward Segrest, Asst. U.S. Atty., Montgomery, Ala., for Lyng.

James Long, Alabama Dept. of Pensions & Sec. Div. of Legal Services, Montgomery, Ala., for Hornsby.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

In 1986, this court, at the request of two food stamp claimants, declared that the "Secretary of the United States Department of Agriculture's voluntary quit regulation, 7 C.F.R. § 273.7(n) (1986), impermissibly conflicts with the voluntary quit provision in the Food Stamp Act, 7 U.S.C.A. § 2015(d)(1)(B)(ii) (West Supp.1986)," *Anderson v. Lyng,* 644 F.Supp. 1372, 1381 (M.D.Ala.1986); the court also issued an injunction prohibiting the Agriculture Secretary and the Commissioner of the Alabama Department of Human Resources[2] from implementing the regulation in Alabama to the extent the regulation conflicted with the Act.[3] *Id.*

In 1987, the Secretary implemented a new voluntary quit regulation, 7 C.F.R. § 273.1(d)(2) (1987). Plaintiffs have responded with a motion for additional declaratory and injunctive relief, arguing that this new regulation also conflicts with the Food Stamp Act. For the reasons that follow, the court holds that the new regulation does not impermissibly conflict with the Act.

### I.

The Food Stamp Act, as this court has previously explained, provides that an entire household is ineligible to participate in a state food stamp program for 90 days if the "head of household" voluntarily quits any job without good cause. 7 U.S.C.A. § 2015(d)(1)(B)(ii). The new regulation promulgated by the Agriculture Secretary pursuant to this statutory provision substitutes "principal wage earner" for "head of household" and, accordingly, provides that the household is ineligible if the principal wage earner voluntarily quits any job without good cause. 7 C.F.R. § 273.1(d)(2) (1987). The regulation defines principal wage earner as "the household member ... who is the greatest source of earned income in the two months prior to the month of the violation." *Id.* The regulation, however, exempts from the definition anyone who works less than 20 hours a week, earns less than a stated minimum, or lives with a parent or person fulfilling the role of parent who meets certain stated requirements.[4] *Id.*

---

2. In earlier opinions, the court refers to the Commissioner of the Alabama Department of Human Resources as the Commissioner of the Alabama Department of Pensions and Security. The Department was recently renamed the Alabama Department of Human Resources, and the court has, accordingly, changed the name of the Commissioner.

3. In early 1987, the court issued orders certifying a plaintiff class and requiring the Commissioner of the Alabama Department of Human Resources to give notice to the plaintiff class of the procedures by which they may receive determinations of eligibility for benefits. *Anderson v. Lyng,* 652 F.Supp. 1237 (M.D.Ala.1987).

4. The new regulation, § 273.1(d)(2), provides as follows:

... [H]ead of household shall be considered to be the principal wage earner. The principal wage earner shall be the household member (including excluded members) who is the greatest source of earned income in the two months prior to the month of the violation. This provision applies only if the employment involves 20 hours or more per week or provides weekly earnings at least equivalent to the Federal Minimum wage multiplied by 20 hours. No person of any age living with a parent or person fulfilling the role of a parent who is registered for work or exempt from

90

The plaintiffs contend that they have all been adversely affected by the new regulation. Plaintiff Diane Carter, who has four children, is responsible for her household. She rented her apartment, paid all the bills, and bought the family's food; she was also the one who applied for food stamps and the food stamps were received in her name. Her family's food stamps were cut off because her husband, whom she had recently married and who earned more than she did, quit his job, apparently without good cause. Plaintiff Sadie Smith is a 75–year–old disabled widow.[5] Although the rent and utilities for her home are in her name, she was denied food stamps because her 36–year–old son, who lives with her, quit his job, apparently without good cause. Plaintiff Bertha Jackson is a 58–year–old disabled woman.[6] Her application for food stamps was denied because her 30–year–old son, who lives with her, quit his job, apparently without good cause. Finally, plaintiff Hessie Anderson has been told by the food stamp office that her household's food stamps will be cut off because one of her sons quit his job and took a lesser paying one. Several of her other children have jobs, but evidently they earn less than did the child who changed jobs. Her husband is unable to work because he has cancer.[7]

## II.

### A.

In its 1986 opinion, this court explained that "the modern food stamp program was started in the early 1960's to address the widespread hunger and malnutrition problem in our society." *Anderson v. Lyng*, 644 F.Supp. at 1373. The court further explained that "Congress sought to limit the program to those who were truly needy by encouraging applicants and participants who were capable of working to do so. As a House Committee recognized in 1970, it is still desirable for those who can do so to work in order to support themselves and their families. H.R.Rep. No. 91–1402, 91st Cong., 2nd Sess., *reprinted in* 1970 U.S. Code Cong. & Ad.News 6025, 6034." *Id.* And with the voluntary quit provision, as this court explained, "Congress sought to place increased emphasis 'on providing benefits to those who are unable to provide for themselves and less to those, such as in this situation, who have *made* themselves "needy." ' Senate Rep. No. 97–504, 97th Cong., 2nd Sess., *reprinted in* 1982 U.S. Code Cong. & Ad.News 1641, 1677 (emphasis in original)." *Id.*

The court then set forth the criteria a court should use to determine, and the manner in which a court should assess, whether an agency's interpretation of a legislative act is permissible under that act:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress, If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the

work registration requirements because such parent or person fulfilling the role of a parent is subject to and participating in the work incentive program under Title IV of the Social Security Act, or is in receipt of unemployment compensation (or has registered for work as part of the unemployment compensation application process), or is employed or self employed and working a minimum of 30 hours weekly or receiving weekly earnings equal to the Federal minimum wage multiplied by 30 hours shall be considered the head of household. If there is no principal source of earned income in the household, the household may designate the head of house.

5. Smith does not participate in the work incentive program or receive unemployment compensation. *See* note 4, *supra.*

6. Jackson does not participate in the work incentive program or receive unemployment compensation. *See* note 4, *supra.*

7. Neither Anderson nor her husband participates in the work incentive program or receives unemployment compensation. *See* note 4, *supra.*

statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. 644 F.Supp. at 1373–74 (*quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted)). In other words, absent evidence that Congress has expressly given a statutory provision a particular interpretation, a court must give deference to any reasonably acceptable interpretation by the agency. *Id.,* at 1375.

The court then applied the above precepts to conclude that the voluntary quit provision then in force was "illogical and unworkable and contrary to the plain meaning of the statutory provision." *Id.* The court, throughout its opinion, was most concerned that an entire household could be disqualified from receiving food stamps simply because a *child* in that household quit his or her job. The court believed that it was clear from both the language and history of the Food Stamp Act and the voluntary quit regulation that Congress did not intend such a result.

### B.

Under the new regulation, the fact that a child has voluntarily quit his or her job will not disqualify that child's entire household if the child's parent meets one of the following requirements: is working at least 30 hours a week, is earning a stated minimum wage, is registered to work as required by the regulation, or is exempt from the registration requirements.[8] The Agriculture Secretary and the Human Resources Commissioner contend that these provisions in the new regulation redress the above concerns of the court. Indeed,

plaintiffs agree that the new regulation "eliminated some of the more egregious household-wide disqualifications that occurred" under the old regulation.[9] The plaintiffs argue, however, that the new regulation does not go far enough.

The plaintiffs first argue that the new regulation still permits some households to be unfairly disqualified. The Fourth Circuit Court of Appeals, in deflecting a similar attack on the new regulation, observed that "Legislation and regulation necessarily involve inclusion and exclusion along general lines that may affect particular individuals in ways that seem arbitrary or unfair." *Wilson v. Lyng,* 856 F.2d 630, 633 (1988). The court went on to state that "it is the duty of the legislature and its delegates, however, not the courts, to weigh the general benefit of laws against the possibility that they will unfairly burden particular individuals." *Id.* The court then concluded that

> "concern for a particularized situation is not grounds for voiding a regulation designed to deal with thousands of cases.... In a social welfare case we must recognize the 'limitations on the practical ability of the State to remedy every ill.'" *Lugo v. Schweiker,* 776 F.2d 1143, 1150–51 (3d Cir.1985), (*quoting Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982).

*Id.*[10] A charge that a regulation is imperfect is therefore insufficient to defeat the regulation.

The plaintiffs also repeat an argument which they made earlier in their challenge to the old regulation. They contend, based on the legislative and administrative history of the term head of household, that the term should be defined as the "responsible person selected to file a food stamp application for the household."[11] This court previously rejected this restricted definition, observing that

---

**8.** *See* note 4, *supra.*

**9.** Plaintiffs' brief, filed September 24, 1987, p. 2–3.

**10.** The Fourth Circuit also upheld the old regulation. *See also Verna v. Coler,* 710 F.Supp.

1339 (S.D.Fla.1989) (upholding the old regulation). This court disagrees with these holdings.

**11.** Plaintiffs' brief, filed September 24, 1987, p. 12.

It is clear from the preceding discussion that the plaintiffs' definition is also inappropriate. Although state agencies and the Secretary have often referred to the head of household as the person in whose name the food stamp application is made, it is apparent from the legislative and administrative history of the voluntary quit statutory provision and regulation that this reference is more or less an effort to require that the head of the household be the applicant, if possible. *Anderson v. Lyng*, 644 F.Supp. at 1380–81 n. 8. The court observed that the term has not been so restricted in its historical usage. "[M]any ... state agencies," the court explained, "have viewed the term in more economic terms and defined head of household as the person who normally or actually assumes primary financial responsibility for the household." *Id.*, at 1375–76. *See also Wilson v. Lyng*, 856 F.2d at 634 (by the term head of household in the voluntary quit provisions, Congress intended to place on the individual most responsible for household finances the incentive to remain employed).[12]

The court will therefore enter an order denying the plaintiffs' motion for additional declaratory and injunctive relief.

12. Indeed, the Fourth Circuit maintains that a definition such as that advanced by the plaintiffs here would "eviscerate the voluntary quit provision" because it would allow each household to choose its own head. *Wilson v. Lyng*, 856 F.2d at 635.