# BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM *v.* DIMENSION FINANCIAL CORP. ET AL.

No. 84–1274.   Argued November 4, 1985—Decided January 22, 1986

BURGER, C. J., delivered the opinion of the Court, in which all other Members joined, except WHITE, J., who took no part in the consideration or decision of the case.

*Michael Bradfield* argued the cause for petitioner. With him on the briefs was *James V. Mattingly, Jr.*

*Jeffrey S. Davidson* argued the cause for respondents Dimension Financial Corp. et al. With him on the brief were *David G. Norrell, Glenn Summers,* and *William L. Mitchell. John D. Hawke, Jr.,* argued the cause for respondents American Financial Services Association et al. With him on the brief were *Leonard H. Becker, Douglas L. Wald,* and *Louis A. Hellerstein.**

---

*Briefs of *amici curiae* urging reversal were filed for the Conference of State Bank Supervisors et al. by *Erwin N. Griswold, J. Thomas Cardwell, Laura N. Pringle,* and *James F. Bell;* and for the Independent Bankers Association of America by *Leonard J. Rubin.*

Briefs of *amici curiae* urging affirmance were filed for the United States by *Acting Solicitor General Fried, Acting Assistant Attorney General Willard, Deputy Solicitor General Claiborne, John F. Cordes, Freddi*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the Federal Reserve Board acted within its statutory authority in defining "banks" under § 2(c) of the Bank Holding Company Act of 1956, 12 U. S. C. § 1841 *et seq.*, as any institution that (1) accepts deposits that "as a matter of practice" are payable on demand and (2) engages in the business of making "any loan other than a loan to an individual for personal, family, household, or charitable purposes" including "the purchase of retail installment loans or commercial paper, certificates of deposit, bankers' acceptances, and similar money market instruments." 12 CFR § 225.2(a)(1) (1985).

## I

## A

Section 2(c) of the Bank Holding Company Act defines "bank" as any institution "which (1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans." 70 Stat. 133, as amended, 12 U. S. C. § 1841(c).

This case is about so-called "nonbank banks"—institutions that offer services similar to those of banks but which until recently were not under Board regulation because they conducted their business so as to place themselves arguably outside the narrow definition of "bank" found in § 2(c) of the Act. Many nonbank banks, for example, offer customers NOW (negotiable order of withdrawal) accounts which function like conventional checking accounts but because of prior notice provisions do not technically give the depositor a "legal right to withdraw on demand." 12 U. S. C. § 1841(c)(1). Others offer conventional checking accounts, but avoid classification as "banks" by limiting their extension of commercial credit to

*Lipstein,* and *Mary Ann Gadziala;* and for Sears, Roebuck and Co. et al. by *Theodore B. Olson, Philip M. Knox, Jr., David Shute,* and *Peter J. Wallison.*

the purchase of money market instruments such as certificates of deposit and commercial paper.

In 1984, the Board promulgated rules providing that nonbank banks offering the functional equivalent of traditional banking services would thereafter be regulated as banks. 49 Fed. Reg. 794. The Board accomplished this by amending its definition of a bank, found in "Regulation Y," in two significant respects. First, the Board defined "demand deposit" to include deposits, like NOW accounts, which are "as a matter of practice" payable on demand. 12 CFR § 225.2 (a)(1)(A) (1985). Second, the Board defined the "making of a commercial loan" as "any loan other than a loan to an individual for personal, family, household, or charitable purposes," including "the purchase of retail installment loans or commercial paper, certificates of deposit, bankers' acceptances, and similar money market instruments." 12 CFR § 225.2(a)(1)(B) (1985).

B

Cases challenging the amended Regulation Y were commenced in three Circuits and were consolidated in the United States Court of Appeals for the Tenth Circuit.[1] The Court of Appeals set aside both the demand deposit and commercial loan aspects of the Board's regulation. 744 F. 2d 1402 (1984). The court did not discuss the demand deposit regulation in detail, relying instead on the holding of an earlier Tenth Circuit case, *First Bancorporation* v. *Board of Governors*, 728 F. 2d 434 (1984). In *First Bancorporation*, the court noted that the statutory definition of demand deposit is a deposit giving the depositor "a *legal right* to withdraw on demand." The court recognized that "withdrawals from NOW accounts are in actual practice permitted on demand." *Id.*, at 436. But, since the depository institution retains a technical prior notice requirement it does not, for the pur-

---

[1] Cases filed in the United States Courts of Appeal for the Fourth and Sixth Circuits were transferred to the Tenth Circuit pursuant to 28 U. S. C. § 2112(a).

poses of Congress' definition of "bank," accept "deposits that the depositor has a legal right to withdraw on demand."

The Court of Appeals also concluded that the Board's new definition of "commercial loan" was at odds with the Act. The legislative history revealed that in passing § 2(c) Congress intended to exempt from Board regulation institutions whose only commercial credit activity was the purchase of money market instruments. Although agencies must be "able to change to meet new conditions arising within their sphere of authority," any expansion of agency jurisdiction must come from Congress and not the agency itself. 744 F. 2d, at 1409. Accordingly, the Court of Appeals invalidated the amended regulations.

We granted certiorari. 471 U. S. 1064 (1985). We affirm.

## II

The Bank Holding Company Act of 1956, 12 U. S. C. § 1841 *et seq.*, vests broad regulatory authority in the Board over bank holding companies "to restrain the undue concentration of commercial banking resources and to prevent possible abuses related to the control of commercial credit." S. Rep. No. 91–1084, p. 24 (1970). The Act authorizes the Board to regulate "any company which has control over any bank." 12 U. S. C. § 1841(a)(1).

The breadth of that regulatory power rests on the Act's definition of the word "bank." The 1956 Act gave a simple and broad definition of bank: "any national banking association or any State bank, savings bank, or trust company." 12 U. S. C. § 1841(c) (1964 ed.). Experience soon proved that literal application of the statute had the unintended consequence of including within regulation industrial banks offering limited checking account services to their customers. These institutions accepted "'funds from the public that are, in actual practice, repaid on demand.'" Amend the Bank Holding Company Act of 1956: Hearings on S. 2253, S. 2418,

and H. R. 7371 before a Subcommittee of the Senate Committee on Banking and Currency, 89th Cong., 2d Sess., 447 (1966) (letter to the Committee from J. L. Robertson, Member, Federal Reserve Board). Although including these institutions within the bank definition was the "correct legal interpretation" of the 1956 statute, the Board saw "no reason in policy to cover such institutions under this act." *Ibid.* Congress agreed, and accordingly amended the statutory definition of a bank in 1966, limiting its application to institutions that accept "deposits that the depositor has a legal right to withdraw on demand."[2]

The 1966 definition proved unsatisfactory because it too included within the definition of "bank" institutions that did not pose significant dangers to the banking system. Because one of the primary purposes of the Act was to "restrain undue concentration of . . . commercial credit," it made little sense to regulate institutions that did not, in fact, engage in the business of making commercial loans. S. Rep. No. 91–1084, p. 24 (1970). Congress accordingly amended the definition, excluding all institutions that did not "engag[e] in the business of making commercial loans." Since 1970 the statute has provided that a bank is any institution that

> "(1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans." 12 U. S. C. § 1841(c).

### III

In 1984, the Board initiated rulemaking to respond to the increase in the number of nonbank banks.[3] After hearing

---

[2] The Senate Report explained, "the bill redefines 'bank' as an institution that accepts deposits payable on demand (checking accounts), the commonly accepted test of whether an institution is a commercial bank so as to exclude institutions like industrial banks and nondeposit trust companies." S. Rep. No. 1179, 89th Cong., 2d Sess., 7 (1966).

[3] The Board explained that since 1980 a large number of insurance, securities, industrial, and commercial organizations have acquired Federal Deposit Insurance Corporation insured financial institutions that are the

views of interested parties, the Board found that nonbank banks pose three dangers to the national banking system. *First,* by remaining outside the reach of banking regulations, nonbank banks have a significant competitive advantage over regulated banks despite the functional equivalence of the services offered. *Second,* the proliferation of nonbank banks threatens the structure established by Congress for limiting the association of banking and commercial enterprises. See 12 U. S. C. § 1843(c)(8) (bank holding company can purchase nonbanking affiliate only if entity "closely related to banking"). *Third,* the interstate acquisition of nonbank banks undermines the statutory proscription on interstate banking without prior state approval. 49 Fed. Reg. 794, 835–836 (1984). Since the narrowed statutory definition required that both the demand deposit and the commercial loan elements be present to constitute the institution as a bank, the Board proceeded to amend Regulation Y redefining both elements of the test. We turn now to the two elements of this definition.

### A

The Board amended its definition of "demand deposit" primarily to include within its regulatory authority institutions offering NOW accounts. A NOW account functions like a traditional checking account—the depositor can write checks that are payable on demand at the depository institution. The depository institution, however, retains a seldom exercised but nevertheless absolute right to require prior notice of withdrawal. Under a literal reading of the statute, the institution—even if it engages in full-scale commercial lending—is not a "bank" for the purposes of the Holding Company Act because the prior notice provision withholds from the depositor any "legal right" to withdraw on demand. The

---

functional equivalent of banks. The Board also noted that the powers of previously unregulated industrial banks "have substantially expanded . . . making them for all intents and purposes banks" for the purposes of the Bank Holding Company Act. 49 Fed. Reg., at 834.

Board in its amended definition closes this loophole by defining demand deposits as a deposit, not that the depositor has a "legal right to withdraw on demand," but a deposit that "as a matter of practice is payable on demand."

In determining whether the Board was empowered to make such a change, we begin, of course, with the language of the statute. If the statute is clear and unambiguous "that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984). The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress.

Application of this standard to the Board's interpretation of the "demand deposit" element of § 2(c) does not require extended analysis. By the 1966 amendments to § 2(c), Congress expressly limited the Act to regulation of institutions that accept deposits that "the depositor has a legal right to withdraw on demand." 12 U. S. C. § 1841(c). The Board would now define "legal right" as meaning the same as "a matter of practice." But no amount of agency expertise—however sound may be the result—can make the words "legal right" mean a right to do something "as a matter of practice." A *legal* right to withdraw on demand means just that: a right to withdraw deposits without prior notice or limitation. Institutions offering NOW accounts do not give the depositor a legal right to withdraw on demand; rather, the institution itself retains the ultimate legal right to require advance notice of withdrawal. The Board's definition of "demand deposit," therefore, is not an accurate or reasonable interpretation of § 2(c).

B

Section 2(c) of the Act provides that, even if an institution accepts deposits that the depositor has a legal right to withdraw on demand, the institution is not a bank unless it "en-

gages in the business of making commercial loans." Under Regulation Y, "commercial loan" means "any loan other than a loan to an individual for personal, family, household, or charitable purposes," including "the purchase of retail installment loans or commercial paper, certificates of deposit, bankers' acceptances, and similar money market instruments."

The purpose of the amended regulation is to regulate as banks institutions offering "commercial loan substitutes," that is, extensions of credit to commercial enterprises through transactions other than the conventional commercial loan. In its implementing order, the Board explained that "it is proper to include these instruments within the scope of the term commercial loan as used in the Act in order to carry out the Act's basic purposes: to maintain the impartiality of banks in providing credit to business, to prevent conflicts of interest, and to avoid concentration of control of credit." 49 Fed. Reg., at 841.

As the Board's characterization of these transactions as "commercial loan substitutes" suggests,[4] however, money market transactions do not fall within the commonly accepted definition of "commercial loans." The term "commercial loan" is used in the financial community to describe the direct loan from a bank to a business customer for the purpose of providing funds needed by the customer in its business. The term does not apply to, indeed is used to distinguish, extensions of credit in the open market that do not involve close borrower-lender relationships. Cf. G. Munn & F. Garcia, Encyclopedia of Banking and Finance 607 (1983). These latter money market transactions undoubtedly involve the indi-

---

[4] The Board stated in its implementing order that "commercial paper is an important substitute for commercial loans." 49 Fed. Reg., at 840, n. 34. See also *Citicorp*, 69 Fed. Res. Bull. 921, 922 (1983) ("[C]ommercial loans include such commercial loan substitutes as the purchase of commercial paper, bankers acceptances and certificates of deposit, and the sale of federal funds"); Hurley, The Commercial Paper Market, 63 Fed. Res. Bull. 525 (1977) ("[C]ommercial paper is an important substitute for bank credit").

rect extension of credit to commercial entities but, because they do not entail the face-to-face negotiation of credit between borrower and lender, are not "commercial loans."

This common understanding of the term "commercial loan" is reflected in the Board's own decisions. Throughout the 1970's the Board applied the term "commercial loan" to exclude from regulation institutions engaging in money market transactions. For example, in *D. H. Baldwin Co.*, 63 Fed. Res. Bull. 280 (1977), the Board noted that although savings and loans participated in the federal funds market and issued certificates of deposit, they were not "technically 'banks' for the purposes of the Act" because they did not make commercial loans. *Id.*, at 286. The Board recognized that savings and loans resembled banks but concluded that "the decision should be left to Congress whether, in light of the policies underlying the Bank Holding Company Act, such 'near-banks' should be treated as 'banks' or 'nonbanks.'" *Id.*, at 287. See also *American Fletcher Corp.*, 60 Fed. Res. Bull. 868, 869, and n. 8 (1974) (savings and loans participate in the federal funds market and offer certificates of deposit but may not be deemed "banks" within the meaning of the Act). In 1976, the Board's Legal Division found that broker call loans "do not appear to have the close lender-borrower relationship that is one of the characteristics of commercial loans." Letter to Michael A. Greenspan from Baldwin P. Tuttle, Deputy General Counsel, pp. 2–3 (Jan. 26, 1976) (App. 100A–101A). A 1981 internal memorandum summarized the Board's longstanding interpretation of the commercial loan definition:

> "The Board also has concluded that, although commercial in nature, the purchase of federal funds, money market instruments (certificates of deposit, commercial paper, and bankers acceptances) are not considered commercial loans *for the purposes of section 2(c) of the Act*, despite the fact that for other statutory and regulatory purposes these instruments may be considered commer-

cial loans." Federal Reserve System, Office Correspondence (Feb. 10, 1981) (App. 97A) (emphasis in original).[5]

The Board now contends that the new definition conforms with the original intent of Congress in enacting the "commercial loan" provision. The provision, the Board argues, was a "technical amendment to the Act designed to create a narrowly circumscribed exclusion from the Act's coverage." Brief for Petitioner 41. The Board supports this revisionist view of the purpose of the "commercial loan" provision by citing a comment in the "legislative history" indicating that at the time the provision was enacted, it operated to exclude only one institution, the Boston Safe Deposit & Trust Co. The Board does not go so far as to claim that the commercial loan amendment was a private bill, designed only to exempt Boston Safe. It suggests, however, that because the amendment was prompted by the circumstances of one particular institution, the language "commercial loan" should be given something other than its commonly accepted meaning.

The statute by its terms, however, exempts from regulation *all* institutions that do not engage in the business of making commercial loans. The choice of this general language demonstrates that, although the legislation may have been prompted by the needs of one institution, Congress intended to exempt the class of institutions not making commercial loans. Furthermore, the legislative history supports this plain reading of the statute. The Senate Report explained:

"The definition of 'bank' adopted by Congress in 1966 was designed to include commercial banks and exclude those institutions not engaged in commercial banking,

---

[5] The Board contends that these decisions "represented a willingness by the Board to refrain from applying the full scope of the Act in conditions that did not appear to generate the potential for its evasion." 49 Fed. Reg., at 842. But the decisions themselves make no mention of such self-imposed restraint. Rather, the decisions represented the Board's interpretation of the meaning of the statute based on the language of the Act and the legislative history of its passage.

since the purpose of the act was to restrain undue concentration of commercial banking resources and to prevent possible abuses related to the control of commercial credit. However, the Federal Reserve Board has noted that this definition may be too broad and may include institutions which are not in fact engaged in the business of commercial banking in that they do not make commercial loans. The committee, accordingly, adopted a provision which would exclude institutions that are not engaged in the business of making commercial loans from the definition of 'bank.'" S. Rep. No. 91–1084, p. 24 (1970).

The only reference to Boston Safe is in a lengthy banking journal article that Representative Gonzalez entered into the Congressional Record. See 116 Cong. Rec. 25846, 25848 (1970) (indicating that Boston Safe was "[v]irtually the only bank that does no commercial lending"). Such a passage is not "legislative history" in any meaningful sense of the term and cannot defeat the plain application of the words actually chosen by Congress to effectuate its will. Finally, even if the legislative history evidenced a congressional intent to exclude only Boston Safe, which it does not, the Board's expansive definition of "commercial loan" would be an unreasonable interpretation of the statute. At the time the commercial loan provision was enacted, Boston Safe did not "make commercial loans," but did purchase money market instruments such as certificates of deposit and commercial paper. Recognizing the common usage of the term "commercial loan" and the purpose of the 1970 amendment, the Board in 1972 advised Boston Safe that it was not, in fact, a bank for the purposes of the Bank Holding Company Act:

"The Board understands that Boston Safe purchases 'money market instruments,' such as certificates of deposit, commercial paper, and bank acceptances. In the circumstances of this case, such transactions are not regarded as commercial loans for the purposes of the Act." Letter to Lee J. Aubrey, Vice President,

Federal Reserve Bank of Boston, from Michael A. Greenspan, Assistant Secretary, Board of Governors, p. 2 (May 18, 1972) (App. 94A).

Nothing in the statutory language or the legislative history, therefore, indicates that the term "commercial loan" meant anything different from its accepted ordinary commercial usage. The Board's definition of "commercial loan," therefore, is not a reasonable interpretation of § 2(c).

## C

Unable to support its new definitions on the plain language of § 2(c), the Board contends that its new definitions fall within the "plain purpose" of the Bank Holding Company Act. Nonbank banks must be subject to regulation, the Board insists, because "a statute must be read with a view to the 'policy of the legislation as a whole' and cannot be read to negate the plain purpose of the legislation." The plain purpose of the legislation, the Board contends, is to regulate institutions "functionally equivalent" to banks. Since NOW accounts are the functional equivalent of a deposit in which the depositor has a legal right to withdraw on demand and money market transactions involve the extension of credit to commercial entities, institutions offering such services should be regulated as banks.[6]

The "plain purpose" of legislation, however, is determined in the first instance with reference to the plain language of the statute itself. *Richards* v. *United States*, 369 U. S. 1, 9 (1962). Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the

---

[6] In a related argument, the Board contends that it has the power to regulate these institutions under § 5(b), which provides that the Board may issue regulations "necessary to enable it to administer and carry out the purposes of this chapter and prevent evasions thereof." 12 U. S. C. § 1844(b). But § 5 only permits the Board to police within the boundaries of the Act; it does not permit the Board to expand its jurisdiction beyond the boundaries established by Congress in § 2(c).

problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

Without doubt there is much to be said for regulating financial institutions that are the functional equivalent of banks. NOW accounts have much in common with traditional payment-on-demand checking accounts; indeed we recognize that they generally serve the same purpose. Rather than defining "bank" as an institution that offers the functional equivalent of banking services, however, Congress defined with specificity certain transactions that constitute banking subject to regulation. The statute may be imperfect, but the Board has no power to correct flaws that it perceives in the statute it is empowered to administer. Its rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute.[7]

If the Bank Holding Company Act falls short of providing safeguards desirable or necessary to protect the public interest, that is a problem for Congress, and not the Board or the courts, to address. Numerous proposals for legislative reform have been advanced to streamline the tremendously complex area of financial institution regulation. See, *e. g.*,

---

[7] The process of effectuating congressional intent at times may yield anomalies. In *TVA* v. *Hill,* 437 U. S. 153 (1978), for example, we were confronted with the explicit language of a statute that in application produced a curious result. Noting that nothing prohibited Congress from passing unwise legislation, we upheld the enforcement of the statute as Congress had written it. Congress swiftly granted relief to the petitioner in *Hill;* but it did so in a fashion that could not have been tailored by the courts. See Pub. L. 95–632, § 5, 92 Stat. 3760.

Blueprint for Reform: Report of the Task Group on Regulation of Financial Services (July 1984). Our present inquiry, however, must come to rest with the conclusion that the action of the Board in this case is inconsistent with the language of the statute for here, as in *TVA* v. *Hill*, 437 U. S. 153, 194 (1978), "[o]nce the meaning of an enactment is discerned . . . the judicial process comes to an end."

*Affirmed.*

JUSTICE WHITE took no part in the consideration or decision of this case.