**Jeanette VERNA, in behalf of herself and all others similarly situated, Plaintiff–Appellant,**

v.

**Gregory L. COLER, Secretary, Department of Health Rehabilitative Services, Defendant–Third Party–Plaintiff–Appellee,**

v.

**Richard E. LYNG, Secretary, United States Department of Agriculture and Consumer Services, Third–Party Defendant.**

**No. 89–5363.**

United States Court of Appeals, Eleventh Circuit.

Feb. 6, 1990.

---

Sally G. Schmidt, Lake Worth, Fla., for plaintiff-appellant.

Ken Muszynski, General Counsel Dept. HHS, Tallahassee, Fla., for defendant-third party-plaintiff-appellee.

Before HATCHETT and EDMONDSON, Circuit Judges, and DYER, Senior Circuit Judge.

PER CURIAM:

The sole issue on appeal is whether the Federal Food Stamp voluntary quit regulation, 7 C.F.R. 273.7(c), and the regulation defining "head of household" as the household's "primary wage earner," 7 C.F.R. 273.1(d)(2) are inconsistent with the Federal Food Stamp Act, 7 U.S.C. § 2011 *et seq.*, or are valid as a permissible construction of the Act in the exercise of the Secretary's delegated powers. The district court upheld the validity of the regulations and entered summary judgment in favor of the Secretary.

The undisputed facts are that Verna's household included her two children and her boyfriend Riley. He was the primary *wage earner* for the household as that term is used in the regulations notwithstanding Verna's contributions to the household. Riley quit his job without good cause, resulting in the disqualification of Verna's household in accordance with the regulation's definitions.

We agree with the district court that the regulations are not inconsistent with the Act, and adopt the district court's opinion, published at 710 F.Supp. 1339, as the opinion of this court.

AFFIRMED.

HATCHETT, Circuit Judge, dissenting:

Because I believe the HRS regulation conflicts with the Food Stamp Act, I respectfully dissent.

In October, 1985, Jeanette Verna applied for food stamp benefits at the Florida Department of Health and Rehabilitative Services's (HRS) food stamp office in Indian River County, Florida. On the application, Verna named herself as head of the household and listed her two children, Robert and Patricia Verna, and her boyfriend, Lawrence Riley, as members of the household. Although Riley earned more money than Verna, he was a transient member of the household, and even when present, contributed only to the rent. Verna maintained the lease and all utility accounts for the household under her name. In addition, she bought and prepared the family's food and provided for the children's educational and medical needs.

After HRS certified the family's application, Verna submitted monthly eligibility and income reports to the HRS food stamp certification office. On June 26, 1986, Verna received a notice of a case action from her HRS food stamp certification worker informing her that the household was disqualified from receiving food stamps for July—September, 1986, because Riley had voluntarily quit his job without good cause. Under the "voluntary quit" provisions of the HRS manual, any household whose pri-

mary wage earner voluntarily quits a job without good cause becomes ineligible to participate in the food stamp program for three months.

The purpose of the food stamp program is to alleviate "hunger and malnutrition" among low-income households. 7 U.S.C.S. § 2011 (1988). Congress recognized, however, that "it is still desirable for those who can do so to work in order to support themselves and their families." H.R.Rep. No. 91–1402, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 6025, 6034. By enacting the "voluntary quit" provisions, Congress sought to disqualify individuals and households which were otherwise eligible. *See* 7 U.S.C.S. § 2015 (1988). Congress sought to place less emphasis on those "who have *made* themselves 'needy' " when it enacted the voluntary quit provisions. S.Rep. No. 97–504, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Admin.News 1641, 1677 (emphasis in original). The voluntary quit provision provides that when the "head of household" voluntarily quits his or her employment without cause, the entire household loses benefits for up to three months. Pub.L. 95–113, Title XIII, § 1301, Sept. 29, 1977. The term head of household was not defined in the Act. The Secretary of Agriculture, pursuant to statutory authority, promulgated regulations defining "head of household" as the household's primary wage earner. *See* 7 C.F.R. § 273.1(d)(2) (1988).

In reviewing an agency's construction of the statutory term, this court must (1) determine whether Congress has clearly expressed its intent on the precise question at issue, and (2) if congressional intent is unclear, determine whether the agency's determination is reasonable. *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). In conducting the requisite analysis, the court need not determine whether an agency's interpretation is reasonable, if it finds that Congress's intent on the issue is clear.

My primary disagreement with the majority and the district court's opinion, is that they state the proper analysis, but proceed to incorrectly analyze the case. Rather than beginning the analysis by determining whether Congress has clearly expressed its intent on the precise question at issue, the district court proceeds to the second question and considers whether the agency's interpretation of the statute is reasonable. Beginning the analysis where we must, I conclude that when Congress passed the voluntary quit provision, it intended that the term "head of household" refer to the person with primary responsibility for the household. Consequently, I would hold that the HRS's regulation is in conflict with the statute and impermissible.

The first step in determining whether Congress has intended to give a statutory provision a particular meaning is to look to the plain meaning of the provision itself. *Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986). Thus, in construing a statutory term, words will be interpreted according to their ordinary, contemporary, and common meaning, unless otherwise defined. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). The term, "head of household," suggests on its face the person most responsible in the household; the person with primary responsibility for the household. *See Anderson v. Lyng,* 644 F.Supp. 1372, 1375 (M.D.Ala.1986). Both the common dictionary definition and Black's Law Dictionary support a similar construction of the term. *Webster's New Collegiate Dictionary,* 522 (1979) ("head" defined as principal, chief); *Black's Law Dictionary,* 648 (1979) ("head of household" defined as individual who actually supports and maintains individuals who are closely connected with him or her).

The legislative history of the voluntary quit provision also indicates that Congress intended that the term "head of household" mean the person with primary responsibility for the family. According to a House Report, prior to 1977, application to the Food Stamp Program required that "[t]he household, through its head or spouse or his or her authorized representative," fill out the application. H.R.Rep. No. 464,

95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Admin.News 1704, 1971, 2199. "Where it is impossible for the head of the household or the spouse to make application, a household member may be designated as the authorized representative." *Id.* at 2200.

The term "head of household" is used in other agencies to define a person who assumes general responsibility for the household. For example, the Social Security Administration considers an applicant/recipient of the Social Security Income Program to be a "head of household [if he or she is] responsible for the day-to-day decisions on the operation of [the] household." 20 C.F.R. § 416.1866(a) (1988). Likewise, the Bureau of Indian Affairs defines head of household as "that individual who speaks on behalf of the members of the household and who is designated by the household members to act as [the head]." 25 C.F.R. § 700.69(b) (1988).

The use of the term "primary wage earner" clearly connotes a different concept from the term "head of household." Congress could have chosen to use the term "primary wage earner" in the voluntary quit provision. Instead, the term "head of household" was the only term used in the Act for more than ten years, without any reference to the term "primary wage earner." This fact further leads me to reject any attempt by the agency to substitute one term for the other.

Interpreting the term "head of household" in accordance with its plain meaning would not frustrate the purpose of the Act. In fact, the plain-meaning interpretation is consistent with the Act's overall purpose of "safeguard[ing] the health and well-being of the Nation's population by raising levels of nutrition among low-income households ... [by] permit[ting] low-income households to obtain a more nutritious diet." 7 U.S.C. § 2011. The plain-meaning interpretation would permit low income households to continue to receive a more nutritious diet by increasing the food purchasing power for all eligible households.

In the context of the voluntary quit provision, the term "head of household" de-

scribes the person whose conduct will be the sole factor in disqualifying an entire household from receiving food stamp benefits. In seeking to discourage an entire household from making itself needy, Congress undoubtedly sought to address the conduct of the leader or other responsible person in the household. It is inconceivable that Congress intended that the action of an irresponsible member of the household would disqualify the entire household, simply because that member earns more money than the person primarily responsible for the household.

Having found that Congress clearly intended that the term head of household mean the person with primary responsibility for the household, I place little significance on the fact that the term primary wage earner appeared, for the first time, in the House and Senate Conference Reports in 1981, as if it were equivalent to the term head of household. This usage of the term, four years after the voluntary quit provision was enacted, cannot substitute for the clear congressional intent which existed at the time the legislation was first enacted. *See Southeastern Community College v. Davis,* 442 U.S. 397, 411 n. 11, 99 S.Ct. 2361, 2370 n. 11, 60 L.Ed.2d 980 (1979).