**MAINE ASSOCIATION OF INTERDE-
PENDENT NEIGHBORHOODS,
et al., Plaintiff,**

v.

**COMMISSIONER, MAINE DEPART-
MENT OF HUMAN SERVICES,
Defendant and Third–Party Plaintiff,**

v.

**Clayton YEUTTER, Secretary, United
States Department of Agriculture,
Third–Party Defendant.**

**Civ. No. 88–0240–B.**

United States District Court,
D. Maine.

March 1, 1990.

Jack Comart, Pine Tree Legal Assistance, Inc., Augusta, Me., for plaintiff.

Marina E. Thibeau, Asst. Atty. Gen., Dept. of Human Services, Augusta, Me., for Maine Dept. of Human Services.

Michael M. DuBose, Asst. U.S. Atty., Bangor, Me., for Richard E. Lyng.

## MEMORANDUM OF DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

Plaintiff filed a complaint on October 17, 1988, challenging the "voluntary quit" and "income deduction" regulations that Defendant promulgated in accordance with federal regulations concerning the federally funded food stamp program. Defendant filed a third-party complaint against the Secretary of the United States Department of Agriculture seeking indemnification should the Court find Defendant liable.

All parties filed Motions for Summary Judgment.[1]

Plaintiff challenges the voluntary quit regulations that the Secretary and Defendant promulgated. The Food Stamp Act states that when the "head of the household" voluntarily quits his or her job without good cause, the entire household is disqualified from receiving food stamps for ninety days.[2] 7 U.S.C. § 2015(d)(1)(B)(ii). The Secretary's regulation defines "head of household" as the family's principal wage earner.[3] 7 C.F.R. § 273.1(d)(2). Plaintiff claims that the Secretary's definition of "head of household" is inconsistent with Congress's intended definition, and that the Secretary thereby usurped the legislative authority required to define the scope of the statute. The Secretary argues that his regulation is reasonable and that the Court should defer to his regulation because Congress did not speak directly on the meaning of "head of household."

Plaintiff also challenges the income deduction rule. The Food Stamp Act states that:

[a]ll households with earned income shall be allowed an additional deduction of 20 per centum of all earned income ... to compensate for taxes, other mandatory deductions from salary, and work expenses....

7 U.S.C. § 2014(e). The Food Stamp Act does not define "income." Prior to 1986, the federal regulations considered general assistance workfare as income from which

---

1. Plaintiff addressed its memorandum in support of its Motion for Summary Judgment to both Defendants, noting that, "in essence, this case is a challenge to federal regulations which have mandated the state's adoption of the challenged regulation." Plaintiff's memorandum at 2. Recognizing Third–Party Defendant's role in creating and enforcing regulations, Defendant wrote no memorandum in support of its Motion for Summary Judgment, but instead adopted Third–Party Defendant's memorandum of law. In light of the fact that Plaintiff's claim is, indeed, a challenge to federal regulations mandated by Third–Party Defendant and adopted by Defendant, the Court will treat Plaintiff's claims, for the purpose of discussion, as though they were a claim against Third–Party Defendant.

2. The Act states in pertinent part:

... (B) no household shall be eligible to participate in the food stamp program ... (ii) if the head of the household voluntarily quits any job without good cause, but, in such a case, the period of ineligibility shall be ninety days.
7 U.S.C.S. § 2015(d)(1)(B)(ii).

3. The Secretary defines "head of household" as follows:
(2) For the purposes of failure to comply with §§ 273.7 and 273.22 head of household shall be considered to be the principal wage earner. The principal wage earner shall be the household member (including excluded members) who is the greatest source of earned income in the two months prior to the month of violations.
...
7 C.F.R. § 273.1(d)(2).

the deduction could be taken. *Garrett v. Lyng*, 877 F.2d 472, 474 (6th Cir.1989), *citing* 43 Fed.Reg. 47903 (Oct. 17, 1978). In 1986, the Secretary revised the regulations so that general assistance workfare could not be considered as earned income. *Id.*, 7 C.F.R. § 273.9(b)(2)(i) (1989).

Plaintiff argues that the Secretary's 1986 decision is arbitrary, irrational, and against the clear intent of Congress. The Secretary states that it is within his authority and discretion to change the regulation. The Secretary provides the following reasons for his change of policy: it saves government money; it is in accord with Congress's treatment of workfare in the program, Aid to Families with Dependent Children (AFDC); and it is in accord with the overall purpose of the Food Stamp Act.

The Court finds that Congress's intent in enacting the "voluntary quit" rule is clear; it contradicts Third–Party Defendant's (Secretary's) and Defendant's interpretation of the rule, and thereby entitles Plaintiff to judgment as a matter of law as to the voluntary quit regulations. The Secretary's and Defendant's income deduction regulations, however, manifest a permissive interpretation of an ambiguous term contained in the underlying Food Stamp Act, and, therefore, the Secretary and Defendant are entitled to judgment as a matter of law as to the income deduction regulations. Thus, Plaintiff's Motion for Summary Judgment will be granted in part and Defendant's and Third–Party Defendant's Motions for Summary Judgment will be granted in part.

### Discussion

The Supreme Court set out the basis for proper judicial review of an agency's statutory interpretation in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron*, the Supreme Court stated that courts must begin their analysis by determining whether the "intent of Congress is clear." *Id.* at 842, 104 S.Ct. at 2781. If Congress's intent is clear, then the regulation must be fully

consistent with the statutory meaning. *Id.* at 842–43, n. 9, 104 S.Ct. at 2781, n. 9; *National Labor Relations Board v. United Food & Commercial Workers*, 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987). If the intent of Congress is *not* clear, courts must defer to the agency's interpretation of the statute, provided that it is based on a permissible construction and is rational. *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781; *National Labor Relations Board*, 484 U.S. at 123, 108 S.Ct. at 420.

To apply the first step of analysis, the Court must employ its traditional tools of statutory construction to ascertain Congress's clear intention, if such a clear intention exists. *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9; *Immigration and Naturalization Service v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 1220–21, 94 L.Ed.2d 434. The starting point in any interpretation of a statute is with the plain meaning of the provision itself. *Board of Governors v. Dimension Financial Corporation*, 474 U.S. 361, 368, 373, 106 S.Ct. 681, 688, 88 L.Ed.2d 691 (1986). A court must, however, analyze "the language and design of the statute as a whole. *K Mart Corporation v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988).

The Court must also analyze the history of the provision and the overall purpose of the statute to discern if Congress's intent was clear. *Wilcox v. Ives*, 864 F.2d 915, 924 (1st Cir.1988), *citing Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority*, 464 U.S. 89, 98 n. 8, 104 S.Ct. 439, 444 n. 8, 78 L.Ed.2d 195 (1983); *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); *Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979). When Congress utilizes a phrase that has an accepted definition, a court must infer that Congress meant to incorporate the accepted definition unless the statute otherwise defines the language. *See, Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314,

62 L.Ed.2d 199 (1979); *St. Paul Fire & Marine Insurance Company v. Barry,* 438 U.S. 531, 541, 98 S.Ct. 2923, 2929, 57 L.Ed.2d 932 (1978). Furthermore, the issue of Congressional intent must focus on Congress's intent *at the time of enactment. See Southeastern Community College v. Davis,* 442 U.S. 397, 411 n. 11, 99 S.Ct. 2361, 2369–70 n. 11, 60 L.Ed.2d 980 (1979).

### Voluntary Quit Rule

The Secretary argues that the Court may overturn the agency's interpretation only if the legislative history demonstrates that Congress would not have sanctioned the agency's regulation. Secretary's memorandum at 14. As noted in the discussion above, however, the first issue is whether Congress manifested a clear intent. If, by utilizing the traditional tools of statutory construction, the Court determines Congress's clear intent, the Court must decide whether the Secretary's regulation is consistent with that intent. Thus, the Court will defer to the agency in the manner that the Secretary described only if the terms of the statute are ambiguous or Congress's intent is unclear.

■ While courts have differed as to whether "head of household" manifests a clear congressional intent,[4] this Court finds that Congress's clear intent is evidenced by the legislative history and prior accepted definition of the phrase. Congress intended the phrase to refer to the household member in whose name the application is made for participation in the program. Congress further intended that this head of household be a responsible household member. The Secretary's definition and regulation are inconsistent with the statute and, therefore, are invalid.

The Food Stamps Act does not define "head of household." Some courts argue that "head of household" has a plain and accepted meaning; the household member responsible for making decisions for the household. *Verna v. Coler,* 893 F.2d 1238 (11th Cir.1990) (Hatchett, J., dissenting); *Anderson v. Lyng,* 644 F.Supp. 1372, 1375 (M.D.Ala.1986). Both the *Anderson* court and Judge Hatchett found that the phrase's plain meaning, derived from *Webster's New Collegiate Dictionary* and *Black's Law Dictionary,* contradicts the definition provided by the Secretary. *Verna v. Coler,* 893 F.2d 1238 (11th Cir.1990) (Hatchett, J., dissenting); *Anderson v. Lyng,* 644 F.Supp. 1372, 1375 (M.D.Ala.1986). While this Court is not convinced that "head of household" evidences a common meaning outside the context of the Food Stamp Act, the phrase clearly has a plain meaning when used within the statute's context.

Head of household had a clear and accepted meaning at the time Congress passed the voluntary quit rule: the responsible household member in whose name the household participates in the food stamp program. In fact, the Secretary had defined "head of household" as the person in whose name application is made for the program at the time the original Food Stamp Act became law in 1964, or for approximately thirteen years prior to the passing of the initial voluntary quit rule in 1977. *See* 7 C.F.R. § 1600.2(s) (1965); 7 C.F.R. 270.2(gg) (1976); 43 Fed.Reg. 18879 (May 2, 1978). When Congress passed the rule in 1977, it utilized the accepted meaning of the phrase. The Secretary's memorandum in support of his Motion to Dismiss notes that Congress "had relied on the historic usage of the term head of household when enacting the 1977 voluntary quit provision."[5] Secretary's memorandum at 14.

---

**4.** Indeed, courts faced with deciding if the Secretary's definition is consistent with legislative intent have arrived at varying conclusions. *See Wilson v. Lyng,* 856 F.2d 630 (4th Cir.1988) (court found Secretary's definition reasonable); *Verna v. Coler,* 710 F.Supp. 1339 (S.D.Fla.1989) (court found Secretary's definition reasonable), *aff'd,* 893 F.2d 1238 (11th Cir.1990); *Dubuque v. Yeutter,* 728 F.Supp. 303 (D.Vt.1989) (court found Secretary's definition inconsistent with

clear statutory meaning); *Anderson v. Lyng,* 644 F.Supp. 1372 (M.D.Ala.1986) (court found Secretary's definition inconsistent with clear statutory meaning).

**5.** Indeed, it is because the voluntary quit rule would place "new importance on the definition of household head," that the Secretary redefined the phrase in 1978. 43 Fed.Reg. 18879 (May 2, 1978). In fact, the Secretary has not adopted "primary wage earner" as the definition for

The legislative history reveals Congress's intent to adopt the phrase's historical definition.[6] The House of Representatives, at the time of the passing of the voluntary quit provision, and in relation to that provision, stated that:

There is no prohibition, however, against the head of a household (that member in whose name application is made for participation in the program) that was, while the head was working, ineligible for food stamps quitting work and thereby rendering the entire household eligible for food stamps.

1977 U.S.Code Cong. & Admin.News 2138. Thus, Congress defined "head of household" as that member in whose name application is made for participation in the food stamp program. *Id.* The Secretary correctly states that the House of Representative "referenced the then-effective regulation" in their passing of the voluntary quit rule. Secretary's memorandum at 14. Thus, it is clear that Congress intended this historic definition of "head of household" when it enacted the voluntary quit rule.

Legislative history from the time of enactment also indicates that Congress intended "head of household" to refer to a responsible household member. The House Report notes that households must apply for food stamps "through its head or spouse or his or her authorized representative...." 1977 U.S.Code Cong. & Admin. News 2199. However, "[w]here it is impossible for the head of the household or the spouse to make application for participation, a responsible household member may be designated as the authorized representative." *Id.* at 2200. The Report states that "[a] responsible adult outside the household may be designated if the head of the household, the spouse, or other responsible household members cannot be interviewed." *Id.* This language indicates that

Congress intended that the "head of household" mean a responsible individual, one who could act for the household by taking on the responsibility of applying for the food stamp program. *Verna v. Coler*, 893 F.2d 1238 (11th Cir.1990) (Hatchett, J., dissenting); *Dubuque v. Yeutter*, 728 F.Supp. 303, 311–12 (D.Vt.1989); *Anderson v. Lyng*, 644 F.Supp. 1372, 1376 (M.D.Ala. 1986).

By utilizing the accepted meaning of the phrase "head of household" when passing the voluntary quit rule, Congress manifested clear intent as to the phrase's definition. The Supreme Court has stated that "a fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *St. Paul Fire & Marine Insurance Company v. Barry*, 438 U.S. 531, 541, 98 S.Ct. 2923, 2929, 57 L.Ed.2d 932 (1978) (where "Congress ... employed terminology that evokes a tradition of meaning, ... [i]t may be assumed, in the absence of indications to the contrary, that Congress intended this language to be read in light of that tradition."). The phrase "head of household" had a common, accepted meaning contemporaneous with the passing of the voluntary quit rule. The phrase had been used since Congress passed the Food Stamp Act in 1964. Thus, absent indications to the contrary, the legislative history of the voluntary quit rule compels this Court to conclude that Congress meant to have "head of household" read in light of the phrase's accepted meaning *within* the Food Stamp Act.

The Secretary argues that while Congress intended to adopt the historic definition of "head of household" when the vol-

---

"head of household" for all regulations, only for the voluntary quit rule. *Compare,* 7 C.F.R. § 273.1(d)(1) (state agencies may designate the head of household or permit the household to do so.) and 7 C.F.R. § 273.1(d)(2) (for purposes of failure to comply with §§ 273.7 and 273.22, *head of household shall be considered to be the principal wage earner.*).

**6.** This historic definition of "head of household" as the responsible household member is also used by other agencies. Both the Social Security Administration and the Bureau of Indian Affairs defines head of household as that person who speaks for the family or is responsible for the day-to-day decisions for the household. *See* 20 C.F.R. § 416.1866(a) (1988); 25 C.F.R. § 700.69(b) (1988).

untary quit rule was created in 1977, Congress intended the phrase to mean principal wage earner when it amended the statute in 1981. Indeed, the House Conference Committee used the two phrases interchangeably in 1981. *See, e.g.*, 1981 U.S. Code Cong. & Admin.News 2315. The Secretary states that since Congress knew of the regulation's definition and did not change the statute, Congress implicitly adopted the new definition. This interpretation of the subsequent legislative history is not, however, persuasive.

As the Supreme Court has stated, statements made "after the enactment of the statute under consideration, cannot substitute for a clear expression of legislative intent at the time of the enactment." *Southeastern Community College v. Davis*, 442 U.S. 397, 411 n. 11, 99 S.Ct. 2361, 2370 n. 11, 60 L.Ed.2d 980 (1979). Furthermore, the amendments did not address the phrase "head of household." Finally, Congress did not use the term principal wage earner when it subsequently amended the statute in 1982 and 1985. Thus, the comments made when Congress created the voluntary quit rule, coupled with the fact that Congress did not use the two phrases interchangeably subsequent to 1981, cause this Court to place little weight on the 1981 House Conference Committee notes.

The Secretary also argues that Congress's "objectives underlying the voluntary quit provision could not be achieved" except with his definition of "head of household." Secretary's memorandum at 12. The Secretary notes that households could apply in the name of a nonworking member, while another member, who supports the household, could voluntarily quit his or her job. The household would thereby avoid the statute's ninety-day disqualification. Thus the Secretary maintains that the purposes of the rule support his definition.

The Secretary's definition, in the absence of congressional intent, may indeed be reasonable. However, Congress clearly intended this provision to apply to the responsible household member in whose name the application was made. Thus, Congress did not intend for an elderly woman, who lives with her bedridden husband and with a teenager who voluntarily quit his job, to be disqualified from food stamp benefits for ninety days. Congress sought to address the household's decision maker or leader in passing this rule. While this member is often the family bread winner, he or she may not be and Congress accepted the consequences of the fact that, in many cases, such might not be the case. The Secretary's definition, while simpler, does not jibe with the actual intent of Congress.

In sum, the legislative history of the Food Stamps Act, and the voluntary quit rule in particular, evidence Congress's clear intent that the phrase "head of household" refer to that household member responsible for the household's participation in the food stamp program. The provisions in the statute manifest Congress's view that the person in whose name the application would be made, would be the responsible household member. Because the phrase "principal wage earner" extends or alters this definition, the regulations containing this definition are invalid.

### *Income Deduction*

In 1986, the Secretary revised federal regulations such that general assistance workfare could not be considered earned income qualifying the worker for the twenty percent income deduction permitted pursuant to 7 U.S.C. § 2014(e). Plaintiff asserts that Congress clearly intended that workfare payments be included as income for the income deduction provision. In the alternative, Plaintiff argues that the Secretary's regulation is arbitrary and unreasonable. The Court finds that Congress did not clearly specify whether workfare payments constituted income, and that the Secretary's interpretation of the Food Stamps Act is permissive.

Nothing in the language of the statute or the legislative history manifests Congress's clear intent to have workfare payments considered income. While the legislative history supports the view that Congress

did not want to penalize households who work and incur work related expenses, and did intend "income" to apply to government training programs,[7] this in no way manifests a clear intent in regard to the treatment of workfare payments. Indeed, the Court finds nothing that indicates that Congress clearly intended the definition of "income" to include general assistance workfare.

Plaintiff also argues that the Secretary's decision is irrational. Plaintiff notes that while the purpose of the provision is to prevent working households from being penalized, the Secretary's regulation penalizes those individuals on a workfare program who incur work related expenses. Furthermore, Plaintiff maintains that the Secretary is not entitled to the deference normally provided by courts to agency regulations because the Secretary changed the policy that was in place from 1978 until 1986.

An agency's interpretation of a statute is entitled to less deference when it conflicts with previous interpretations. *Wilcox v. Ives*, 864 F.2d 915, 924–25 (1st Cir.1988), and cases cited therein. However, the Secretary is certainly entitled to change his position if he provides a reasonable analysis or sets forth reasonable grounds for the change. *See, e.g., Atchison Topeka & Santa Fe Railway v. Wichita Board of Trade*, 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); *American Trucking Association v. Atchison Topeka & Santa Fe Railway*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). The Supreme Court noted that:

> [a]n initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in formal rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 863–64, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984).

The Secretary's reasons for the policy change are reasonable and reveal a permissive interpretation of the statute. *Garrett v. Lyng*, 877 F.2d 472, 476 (1989). The statute contemplates relieving the burden of taxes, other mandatory salary deductions and work expenses. 7 U.S.C. § 2014(e). The Secretary argues that individuals receiving general assistance workfare pay only work expenses, and even these expenses may be reimbursed by the applicable state program. Secretary's memorandum at 19. The Secretary maintains that the Food Stamp Act and the AFDC ought to treat workfare similarly, and notes that the regulations enforcing the AFDC do not include workfare as income. The Secretary points out that the new regulation reduces government costs. Finally, the Secretary notes that Congress's purpose was to provide an incentive to household members to work. Because workfare is mandatory for receipt of general assistance, the "incentive nature of the earned income deduction has no application and workfare should not have earned income status." Secretary's memorandum at 21.

The Secretary provided a reasoned analysis for the rule change and, therefore, his decision cannot be said to be arbitrary. Reducing government costs and providing incentive to people to obtain nongovernment assistance positions are legitimate governmental interests. In the absence of clear statutory intent, the Court will defer to the Secretary's interpretation of the term "income." The Court of Appeals for the Sixth Circuit, confronted with similar facts, also concluded that the Secretary's

---

7.  Plaintiff relies on the following excerpts from the 1977 House Report:

    Congress did not want to "mak[e] it more difficult for a working household with an income at level $X to purchase its food stamps than a non-working household with the identical income because the working household has fewer funds available to buy food after it has incurred outlays for transpor-

tation to and from work and uniforms and similar items."

.    .    .    .    .

The Committee intends that the term "earned income" be construed to apply to any household member who is involved in any training program recognized by any Federal, state, or local government agency.

1977 U.S.Code Cong. & Admin.News 2039–40.

definition of income was permissible. *Garrett v. Lyng,* 877 F.2d 472 (1989).

Accordingly, the Court ORDERS that Plaintiff's Motion for Summary Judgment be, and it is hereby, GRANTED as to the Secretary's and Defendants regulations defining "head of household" as primary or principal wage earner. Furthermore, the Court ORDERS that Defendant and the Secretary's Motion for Summary Judgment be, and it is hereby, GRANTED as to the Secretary's and Defendant's income deduction regulations.